STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION, v. CARO-
LINAS COMMITTEE FOR INDUSTRIAL POWER RATES AND AREA
DEVELOPMENT, INC.; HARRIET COTTON MILLS; HENDERSON
COTTON MILLS; ALEO MANUFACTURING COMPANY; BLADEN-
BORO COTTON MILLS; BURLINGTON INDUSTRIES, INC.; CARO-
LINA BAGGING CO., A DIVISION OF TEXTRON, INC.; CLAYTON SPIN-
NING COMPANY; HADLEY PEOPLES MANUFACTURING COMPANY;
HOLT-WILLIAMSON MFG. CO.; JORDAN SPINNING COMPANY;
LEDBETTER MANUFACTURING COMPANY; LIBERTY HOSIERY
MILLS, INC.; LITTLE COTTON MANUFACTURING COMPANY; PECK
MANUFACTURING COMPANY; COLLINS AND AIKMAN CORPO-
RATION; FRED WHITAKER COMPANY; PILOT MILLS COMPANY;
RAMSEUR INTER-LOCK KNITTING COMPANY; ROCKFISH ME-
BANE YARN MILLS; ROSEBORO SPINNING MILLS PLANT; ROX-
BORO COTTON MILLS; ROYAL COTTON MILLS COMPANY; RUS-
SELL HOSIERY MILLS; SILER CITY MANUFACTURING COMPANY,
INC.; SPOFFORD MILLS, INC.; STERLING COTTON MILLS, INC.;
STEVENS & COMPANY; TOLAR, HART AND HOLT MILLS; WADE
MANUFACTURING COMPANY.

(Filed 10 July 1962.)

**1. Utilities Commission § 1—**

The Utilities Commission may regulate its own procedure and prescribe
and adopt reasonable rules with respect thereto provided it does not in-
fringe upon statutory provisions governing its actions. G.S. 62-12, G.S.
62-26.

**2. Same; Utilities Commission § 6—**

The Utilities Commission must determine whether a hearing brought
before it is a general rate case or a complaint proceeding, and its determi-
nation thereof will not be disturbed in the absence of a clear showing of
prejudice to the complaining party.

**3. Same— Determination by Commission that hearing was a complaint
proceeding held not prejudicial to respondents.**

Change in the rate schedules of a power company, increasing the charge
for maintaining facilities to provide for the maximum demand for energy
used by a customer and decreasing the charge per KWH of energy
furnished, had been approved and put into effect on nearly all of the
company's schedules, but action on the fuel clause provision was de-
ferred until all other rate revisals should be approved or disapproved.
This proceeding was instituted to obtain approval of such revised rate
schedule for a particular class of customers. The allegations of the
petition were to the effect that the new schedule did not appreciably
affect petitioner's rate of return, and did not alter the relationship be-
tween respondents and other classes of customers. The allegations in re-
spondent's answer attacked the general rate structure of petitioner on the
ground that the revised rates, as well as the prior rates, resulted in an
excessive rate of return, and requested in effect, a reduction rates by strik-
ing out the fuel clause rider from the schedules theretofore in effect. *Held:*
The burden was on petitioner to make out its case in accordance with its
allegations, and the act of the Commission in treating the proceeding as a

complaint proceeding rather than a general rate case was not prejudicial to respondents and will not be disturbed, since the order of the Commission would not be *res judicata* in regard to the fuel clause provision, and the question of a general rate hearing may be raised later upon proper procedure by either the Commission or the respondents, and could be determined more properly in such proceeding in which all classes of customers would be given opportunity to be heard.

**4. Same; Electricity § 3—**

Evidence tending to show that the cost of facilities necessary to provide energy to meet the maximum demand of customers has increased, while the cost of producing a KWH of energy has decreased, *held* to support the order of the Utilities Commission approving a rate schedule which, while not increasing the total revenue to the utility, would increase the percentage of revenue from the demand component while decreasing the revenue per KWH of energy furnished.

**5. Same—**

A rate schedule must be fair, just and reasonable to the utility as well as to the consumer.

**6. Utilities Commission § 9—**

The courts have no authority to regulate utilities but may consider only questions of law presented on appeal from orders of the Utilities Commission.

DENNY C. J., took no part in the consideration or decision of this case.

APPEAL by protestants from *Fountain, S.J.,* September 18, 1961, Civil Term of WAKE.

Application to the North Carolina Utilities Commission (Commission) by Carolina Power & Light Company (Carolina) for approval of revised rate schedule applicable to electric service to textile mills. Carolinas Committee for Industrial Power Rates and Area Development, Inc., and twenty-nine textile mill companies (protestants) were permitted to intervene and filed protest.

After hearing, the Commission approved the revised schedule. The order of the Commission approving the schedule was affirmed on appeal to Superior Court.

Protestants appeal to Supreme Court.

*Broughton and Broughton, and Lake, Boyce and Lake for appellants.*
*Joyner and Howison and Shearon Harris for appellee.*

MOORE, J. Protestants contend that the judgment below should be reversed and the cause remanded to the Commission for further proceedings. They maintain that the Commission erred as a matter of law in that it (1) restricted the cause to a "complaint proceeding"

when the facts alleged by protestants made a "general rate case" mandatory, (2) refused to admit evidence offered by protestants tending to show an excessive rate of return to Carolina, and (3) made findings of fact not supported by competent, material and substantial evidence.

A summary of proceedings before the Commission is necessary to an understanding and determination of the legal questions involved.

Beginning in 1959 Carolina instituted proceedings before the Commission to revise all of its rate schedules for each class of its customers. The revised schedules were not designed to increase or decrease the amount of revenue which the old rate would exact from each class of customers, nor to increase or decrease the total amount of revenue which the old schedules would produce, nor to disturb the ratio of revenues as between the several classes of customers. The announced purpose of the schedule revisals was "modernization" of the rate schedules, and application of a "fuel adjustment clause" to all classes of customers alike.

According to Carolina, the proposed "modernization" was to bring "established rates and practices in line with present day economic and service conditions." Electric rates are generally based on the cost of rendering service. Many rate schedules consist of two parts, a *demand* charge and an *energy* charge. The energy charge is for the actual number of kilowatt-hours (KWH) of electricity used. The demand charge is for kilo-watt (KW) capacity the power company must maintain to meet the demand or requirement of the customer, though not used. "The revenue effect with respect to the demand charge is largely determined by the load factor, that is, the extent of the use of the services. A customer with a high-load factor pays less in proportion to use than the customer with a low-load factor." The power company must construct, equip and maintain plant and facilities sufficient to produce and provide current to meet the demands of its customers at all times. The *demand* component of the rate schedule is devised to provide for the expenses incident to furnishing facilities and plant to meet customer demand. The *energy* component is designed to meet fuel costs for generating current and day to day operating expenses. Carolina pointed out that the costs for constructing, equipping and maintaining plant and facilities per KW of electric capacity has increased measurably since the old rates were established, and that, because of increased plant efficiency and good management, the cost per KWH for generating current has decreased. Therefore, it was the position of Carolina that the rate schedules should be "modernized" to realistically reflect the increase in *demand* cost and decrease in *energy* cost, by shifting a part of the rate from the energy component to the demand component.

Historically the unit cost of coal has fluctuated. Coal is used to generate most of the electricity produced by Carolina. A "fuel adjustment clause" in a rate schedule provides that for changes in the price of coal per ton a certain increment will be added to, or, in case of reduction in price, subtracted from, the rate per KWH of electric power. The nature and effect of a fuel adjustment clause (Rider 4 applicable to textile mill Rate Schedule P-28) are described in *Utilities Commission v. Light Co.*, 250 N.C. 421, 424, 109 S.E. 2d 253. In the past, fuel adjustment clauses have been applied to some of the rate schedules of Carolina. Carolina asserted that logically such clause should be uniformly applied to all schedules for all classes of customers, and filed a proposed clause to that end.

Prior to 24 May 1960 the Commission had approved the revised rate schedules for all classes of customers of Carolina except textile mills (and a few others not concerned on this appeal). However, the proposed uniform fuel adjustment clause had not been approved — the Commission deferred action on the fuel clause until all other rate revisals had been approved or disapproved.

On 24 May 1960 Carolina filed a revised rate schedule (TM-1) applicable to textile mill service. This schedule provides for a shift of 12% of the total charge from the energy component of the rate to the demand component, and is designed to produce the same revenue as the old schedule or schedules it is to replace.

Carolina filed a petition, and later an amendment thereto, asking for approval of Schedule TM-1 and alleging in substance as follows: Schedule TM-1 has been designed to recover substantially the same revenue as the schedule it replaces; is not designed to produce any effect upon the earnings or rate of return of petitioner and has no discernible effect thereon; and is not designed to, and does not, alter the relationship of textile mill customers as a class to other classes of customers in petitioner's total rate structure. It shifts a portion of the charges previously collected through the energy component to the demand component, and this shifting is just and reasonable, and there has been a similar shifting in other two-part revised rates. Upon approval of TM-1, other schedules and riders applicable to textile mill service, including schedule P-28 and Rider 4, are to be deleted and cancelled. The purpose of TM-1 is to make the rate more modern and equitable, to make it uniform and consistent with other revised rates, and to make the service subject to the same uniform fuel adjustment clause contained in all filed schedules.

On motion, protestants were allowed to intervene. They filed protest which, as amended, alleges in summary: TM-1, and particularly the increase in the demand component of the rate, is unjust, unreasonable,

excessive and prejudicial to protestants. During the 12-months period ending March 1960, under TM-1 "the total revenue paid . . . by all of the textile mills . . . would have been approximately the same as the total revenue paid by them . . . under the combination of Rate Schedule P-28 and . . . Rider 4." But TM-1 is no more equitable than the former rates and, as to protestants, constitutes an increase in rates and, as to Carolina, an increase in return. Former Schedule P-28, without Rider 4 (the fuel adjustment clause), is fair, just and reasonable. Rider 4 is unfair, unjust and unreasonable. The textile mill business is variable and experiences periods of curtailed operations. The Schedule would discriminate against textile mills in favor of other classes of customers, and cause the textile mills to furnish a disproportionate share of Carolina revenue. TM-1 is part of a unified over-all rate revisal which will produce more gross revenue than is necessary for the needs of petitioner to pay all proper charges and expenses, and to earn a fair and reasonable return upon its properties used and useful in rendering electric service.

Carolina filed a written motion to strike from the protest all allegations respecting gross revenues, entire rate structure and rate of return on the properties of petitioner, on the ground that these allegations are unrelated to the subject matter of the petition. And Carolina requested a pre-hearing conference to determine the scope of the hearing to be conducted, and the issues to be considered.

On their part protestants moved: (1) that the Commission order its director of accounting to make an examination of the operations of Carolina and determine its rate of return by reference to a twelve-months test period, and make the results available for the hearing; and (2) that the Commission require Carolina to make a cost of service study as to all classes of customers, and to supply the Commission and protestants with copies of the study prior to the hearing.

The Commission had previously ordered a hearing as to the lawfulness and reasonableness of Schedule TM-1, except for the fuel adjustment provision thereof. As to the fuel clause, hearing was deferred pending investigation; the fuel clause of the schedule was ordered to be heard in relation to all revised schedules for all classes of customers.

In the pre-hearing conference called to consider the motions filed by the parties, Carolina's motion to strike was denied. The Commission's order commented that the protest alleges "matters somewhat foreign to the matters at issue," but "they do not seem to offer any serious threat to the determination of the real matter in interest, and matters pertaining thereto may well be controlled by allowance or disallowance of testimony relating thereto if same is offered at the hearing." The Commission also ruled: "The matter before the Commission

is the one rate schedule, TM-1. Use and application of this schedule requires neither a cost of service study nor a determination of the rate of return of the power company at this time."

At the hearing on the merits, the Commission limited proceedings to a determination of three issues: (1) whether the proposed schedule would produce substantially the same revenue as old Schedule P-28, plus Rider 4; (2) whether there is "any discrimination or disparity with respect to the demand charge and the energy charge components of TM-1 as compared with or as it relates to the class of service to which it applies, or as between those in this class of service and other schedules of the (Power) Company"; and (3) whether the 12% shift from the energy component to the demand component by TM-1 is just and reasonable.

Robert S. Quig, a rate consultant and an expert in regulatory procedure, testified for Carolina in substance as follows: Schedule P-28 came into effect in 1945. For the 12-months period ending in March 1960 (test period), the demand component of P-28 produced (in round numbers) $1,600,000 of the revenue paid by textile mills, or 27%, and the energy component produced $4,300,000, or 73%. TM-1 shifts 12% of the total textile mill revenue from the energy to the demand component, and for the test period its demand component would have produced $2,300,000 revenue, or 39%, and its energy component $3,-600,000, or 61%. From 1945 to 1959 the original cost of plant per KW increased 32%. Largely because of inflation, cost of plant increased more rapidly than KW capacity and use. The trend is still upward. Because of more efficient equipment and good management, the cost of coal per KWH has, since 1945, decreased 35%. Technological improvement in generating machinery has caused better production of power per unit of coal. Coal is by far the greatest item of expense in energy cost. 72% of the current sold by Carolina is generated from coal, and the percentage is increasing. Power rates should reflect the changes in costs — rate making should follow the incidence of costs. Carolina's rate revisals are not drastic. TM-1 is consistent with increased costs related to demand, is a sound rate provision, is consistent with events, and is a more equitable distribution of averages in the same class having varying load factors. The more power the mill uses, the more both it and Carolina saves. The other schedule revisals were on the same basis; rates were balanced so as to make them consistent with each other, and all are designed to, and will, produce the same revenue for each class as the former schedules. The proper relation between demand and energy charges is a matter of judgment. TM-1 during the test period would have produced $6000 less revenue from textile mills than P-28 plus Rider 4. Thirty-three customers

would have individually experienced slight increases, sixty-six slight decreases. Within the class, increases and decreases are within a 3% range up and down. The slight variation is due to load factor. A load factor above 65% results in a decrease, but an increase below that breaking point. The breaking point of P-28 was at about 58% load factor. During the 5-year period, 1955 to 1959, the textile mills, as a class, would have had a savings each year under TM-1. It is a fairer schedule than P-28 plus Rider 4. When in operation textile mills generally operate a high load factor — three shifts, five days a week. Textile customers are treated very favorably and are underpriced. Textile mills consume 15% of Carolina's KWH production, pay only 9% of its revenue, and have a rate of 8 mills. This is the lowest rate of any class of customers, except REA and four municipalities having their own generating plants and buying only supplementary current. The price of coal fluctuates, and a uniform fuel adjustment clause should apply to all schedules of Carolina's rate structure. In a sense Rider 4 is frozen into TM-1. The proposed fuel clause has relatively small revenue effect. It would have accounted for only $3000 of the $5,900,-000 of textile mill revenue during the test period; and only $15,000 of the total revenue of $63,000,000. It produces much less than Rider 4. Carolina's revised rate schedules will produce the same revenue within each class, and the same over-all revenue, as the former schedules.

David A. Kosh, public utilities consultant and expert in public utilities financing, testified for protestants in substance as follows: Carolina's rate revisals are not justifiable. Costs are the basic guides for rates. Equitable rating requires comprehensive cost analysis. Costs should be added to the class of customers giving rise thereto. Joint costs should be allocated to all classes. The proposed rate protects Carolina from future decline in use of electricity. Increases in load factor in textile mills are not as greatly to be anticipated as decreases. The effect of TM-1 depends on load factor. A consumer should pay for his demand, and demand costs do not necessarily fall in proportion to falling load factors. TM-1 is a built-in rate increase for the future.

The Commission excluded from consideration evidence tendered by protestants tending to show: From an analysis of the annual reports of Carolina to its stockholders and to the Commission, covering several of the years from 1949 to 1959, petitioner has had an excessive rate of return, an increase in gross revenues, a decrease in revenue per KWH, an increase in earnings per share of common stock, and increases in maintenance costs, depreciation, taxes, salaries and wages, plant investment, capital, interest, net income, dividends and surplus.

After reviewing proceedings, pleadings, evidence and contentions, the Commission found facts as follows:

"1. Schedule TM-1, . . . replaces . . . Schedule P-28 and Rider No. 4, retains the same over-all revenue for Carolina, and the same over-all cost to the customers under the schedule, but transfers 12 per cent of the energy component to the demand component, producing a more equitable, reasonable and proper spread between demand cost and energy cost.

"2. Cost of plant, construction, equipment and facilities necessary to meet the customer demand has increased tremendously during the periods the replaced schedules have been in use, while during the same periods technological improvements in plant and the decrease in cost of fuel have reduced the energy cost, resulting in imbalance between the energy and the demand components.

"3. Carolina has recently revised its many other schedules on the same basis as Schedule TM-1, . . . to produce a more equitable, reasonable, just and proper spread between demand and energy components.

"4. The same relationship is maintained between customers receiving service under Schedule TM-1, . . . as existed between customers under replaced schedules, and the same relationship is maintained between customers receiving service under Schedule TM-1 and other customers receiving service under other schedules of Carolina as existed under replaced schedules.

"5. Schedule TM-1, Textile Mill Service, constitutes an equitable, just, reasonable and proper revision of the schedules it replaces and more adequately, equitably, justly and properly distributes the cost as between demand charge and energy charge than was the case in the replaced schedules."

The Commission approved Schedule TM-1 and ordered that it become effective as of August 1, 1960. Former schedules, including P-28 and Rider 4, were cancelled.

Protestants contend that the pleadings and the general nature of the proceedings constitute a "general rate case" as a matter of law, requiring the procedure outlined in G.S. 62-124, and that the Commission erred in limiting its hearing to a "complaint proceeding."

We said in *Utilities Commission v. Light Co., supra:*

"In fixing the rate schedules and rate classifications, or in revising said rates and classifications, or a substantial part thereof, the procedure indicated by G.S. 62-124 must be observed. Where the whole or a substantial portion of the rate structure of a public utility is being initially established or is under review, and where the required procedure under G.S. 62-124 is being carried out, the hearing before

the Commission to establish or revise the rates is referred to as a 'general rate case'. . . ."

"Where a public utility has many rate schedules applying to many different classes of service customers and only one rate or a few rates are involved in a petition for amendment, modification or rescission, ordinarily it is not required that the utility's property be valued and that the provisions of G.S. 62-124 be observed in such case. . . ."

"A hearing . . . which involves a single rate or a small part of the rate structure . . . is called a 'complaint proceeding.' It differs from a general rate case in that it deals with an emergency or change of circumstances which does not affect the entire rate structure . . . and may be resolved without involving the procedure outlined in G.S. 62-124, and does not justify the expense and loss of time involved in such procedure."

The petition in this case was drawn pursuant to G.S. 62-71 and involves only a small portion of Carolina's rate structure. It seeks approval of Schedule TM-1 which allegedly is not designed to increase the revenue to be recovered from the textile mill class to which it applies, nor to affect total revenue, nor to disturb the ratio of revenue between classes of users, but proposes an adjustment between the components of the rate more in keeping with changes in costs. The petitioner has the burden of proving these allegations. G.S. 62-26. The proof of these matters does not require determination of rate base or a detailed cost of service showing. No change in rate of return is proposed. The determination of the questions posed by the petition may be had in a complaint proceeding and within the scope of the hearing fixed by the Commission.

The protest is for the most part a general denial of the allegations of the petition. It also purports to allege new matter which might be termed a counterclaim. It alleges that former Schedule P-28, without Rider 4, is just and reasonable, but that Rider 4 (fuel adjustment clause) is unjust, unreasonable and excessive. It also alleges that TM-1 would result in an excessive rate of return. The challenge to Rider 4, a part of an old schedule, is new matter and not germane to the allegations of the petition. The allegation that TM-1 would give Carolina an excessive rate of return seems to be based on the idea (as the tendered evidence tends to show) that Carolina already has an excessive rate of return. It is clear that protestants are, by way of counterclaim, asking for a rate reduction by striking out Rider 4 and leaving schedule components unchanged, and procedure under G.S. 62-124 to show justification for this result.

The Commission had prior to the hearing herein "directed an examination of the books and records of the company (Carolina) looking

to a determination of rate of return." The examination was incomplete at the time of this hearing. The Commission had also deferred consideration of the proposed uniform fuel adjustment clause. It seems that the Commission thought it should first consider TM-1 on the basis alleged in the petition, and determine the reasonableness of the adjustment between its components and whether it was consistent with revisals made in the schedule of other classes of customers, and later, when the examination of Carolina's books was completed, have a general rate hearing in relation to all schedules and the fuel clause, if the examination justifies such procedure. In any event, the Commission determined that only a complaint hearing should be held.

Ordinarily, the procedure before the Commisison is more or less informal, and is not as strict as in superior court, nor is it confined by technical rules; substance and not form is controlling. In the absence of statutory inhibition, the Commission may regulate its own procedure within broad limits, and may prescribe and adopt reasonable rules and regulations with respect thereto, provided such rules are consistent with the statutes governing its actions. G.S. 62-12; G.S. 62-26; 73 C.J.S., Public Utilities, s. 49, pp. 1115-6. Great liberality is indulged in pleadings in proceedings before the Commission, and the technical and strict rules of pleading applicable in ordinary court proceedings do not apply. The Commission may adopt its own rules governing pleadings, and has the power to waive or suspend the rules. It may enlarge or restrict the inquiry before it unless a party is clearly prejudiced thereby. 73 C.J.S., s. 52, p. 1119. Such liberality and informality is essential to the workings of the Commission. In a real sense regulation of public utilities is a continuing and continuous process as to each utility, in order that regulation may be consistent with changing conditions. To bind the Commission strictly by matters pleaded might well hamper its work to the point of ineffectiveness. If by pleading excessive rate of return parties could bring into play G.S. 62-124 and have a complete review of rate structure on every occasion that a matter relating to rate arises, the reasonable regulation of rates would be impossible. "It is within the province of the Commission to determine whether a hearing is a general rate case or a complaint proceeding. Indeed it is necessary as a matter of procedure that such determination be made in every hearing involving the establishment, modification or revocation of rates. The findings of the Commission on this point will not be disturbed in any case in the absence of a clear showing that the right of the parties have been prejudiced." *Utilities Commission v. Light Co., supra.*

In our opinion protestants were not prejudiced by the Commission's ruling as to the scope of the hearing. The matters alleged in the protest

but excluded from the hearing are not *res judicata*. Only specific questions actually heard and finally determined by the Commission in its judicial character are *res judicata*, and then only as to the parties to the hearing. Protestants, if they have grounds therefor and are so advised, may upon complaint and petition assert their right to a general rate inquiry at any time. This fact notwithstanding, it is suggested that protestants are prejudiced because such a complaint and proceeding would cast upon them the burden of proof. The suggestion is invalid. Had the Commission allowed a general rate hearing in this case, the burden as to rate of return would have been upon protestants. Carolina did not propose a change in amount of revenue or rate of return. The challenge to the rate of return arose from protestants' counterclaim. The protestants were therefore complainants, and the burden was upon them. G.S. 62-26. As already indicated, the Commission is considering such inquiry on its own motion. If this materializes, the burden will be cast on Carolina. G.S. 62-26. The deferment of consideration of the fuel clause does not prejudice protestants. Not only protestants but all classes of customers may be heard with respect thereto when it is considered, and it would seem that its effect may be better explored and more clearly shown when it is considered in relation to the total rate structure. It is true that the Commission did not strike the counterclaim in express terms at the pre-hearing conference, but the declaration of the scope of the hearing amounted to a deletion thereof. The protest was so phrased that allegations amounting to a general denial of facts stated in the petition were commingled with the allegations of the counterclaim. The Commission's ruling on the motion to strike and its comments thereon were realistically appropriate. TM-1 is a part of a general scheme of rate revisal. Yet, nearly all of the schedules had been considered and put into effect prior to this hearing.

We find no error in the Commission's ruling as to the scope of the hearing. It follows that there was no error in excluding protestants' tendered evidence as to the general financial affairs of Carolina and its rate of return. Furthermore, it will be observed that none of this evidence is related to the effect of TM-1 but deals with conditions and revenues arising under the former rates. The conclusions reached only affect TM-1 inferentially. Protestants admitted that TM-1 would have produced in the test period approximately the same revenues that P-28 and Rider 4 produced. The contention seems to be that since the old rate resulted in excessive rate of return, according to protestants' witnesses, TM-1 would likewise. Protestants contend that *Utilities Commission v. Light Co., supra,* is authority for the admissibility of such evidence even in a complaint proceeding. We do not so construe it.

The pertinancy and admissibility of such evidence was not under consideration in the *Light Co.* case. The holdings in that case should be considered within the framework of the facts there peculiarly presented. That case merely holds that the sufficiency of a rate is not a one-way street, and where the Commission allows a rate increase in a complaint proceeding to create a sufficiency of income upon consideration of general financial condition, it may reduce the rate in a subsequent complaint proceeding upon the same consideration. It creates no rule of evidence.

The Commission's findings of fact are supported by competent, material and substantial evidence, and they support the order entered. All of the evidence tends to show that TM-1 will exact substantially the same revenue from textile mill customers as did the former schedules, that it will not increase Carolina's total revenues and will not disturb the revenue ratios between classes of consumers. While a proper apportionment of the rate between its demand and energy components is a matter of judgment, there is ample evidence that TM-1 is just, reasonable and proper, is consistent with the incidence of costs, and is more equitable than the former schedule. P-28 was put into effect in 1945. There is no suggestion that its demand and energy components were not in proper adjustment at that time — the presumption is that the components were proper, reasonable and just. On this premise, the evidence shows sufficient increase in demand costs and decrease in energy costs to fully justify the shift embodied in TM-1. Protestants' witness Kosh testified that TM-1 is a built-in rate increase for the future. He predicates this remark on the assumption that the load factor of the textile mills as a whole will substantially decline. While the assumption is mere conjecture, it has been demonstrated that the lower load factor increases the cost of current per KWH within very narrow limits. Mr. Kosh also stated that demand costs do not necessarily fall in proportion to falling load factors. A rate must not only be fair, just and reasonable to the consumer, but fair, just and reasonable to the utility. It is upon this matter that the Commission must make judgment. The Supreme Court has no authority to regulate utilities, it can only consider questions of law. We find in this record no error of law sufficient to disturb the judgment below.

The judgment of the superior court is

Affirmed.

DENNY, C.J., took no part in the consideration or decision of this case.