STATE OF NORTH CAROLINA, EX REL UTILITIES COMMISSION AND CENTRAL TRANSPORT, INC., MAYBELLE TRANSPORT COMPANY, CHEMICAL LEAMAN TANK LINES, AND PUBLIC TRANSPORT CORPORATION, INTERVENORS IN OPPOSITION TO AMENDMENT v. ASSOCIATED PETROLEUM CARRIERS, KENAN TRANSPORT COMPANY, O'BOYLE TANK LINES, INC. AND A. C. WIDENHOUSE, INC., INTERVENORS IN SUPPORT OF AMENDMENT

No. 7110UC462

(Filed 23 February 1972)

1. Carriers § 2; Utilities Commission § 3— motor carriers — rule defining petroleum products — amendment

There was competent, material and substantial evidence to support the Utilities Commission's amendment of a rule applicable to carriers of liquid petroleum in bulk in tank trucks by redefining petroleum products as "those derived from the mainstream of the crude oil and natural gas, containing only the elements of carbon and hydrogen," and by listing products which come within that definition.

2. Carriers § 2; Utilities Commission § 3— motor carriers — State and national transportation policy — adoption of I.C.C. rule

Statutes declaring it to be State policy to cooperate with national transportation policy and coordination of interstate and intrastate public utility services, G.S. 62-2 and G.S. 62-259, do not require the North Carolina Utilities Commission to adopt a rule of the Interstate Commerce Commission with respect to motor carriers.

3. Carriers § 2; Utilities Commission § 3— rule defining petroleum products — finding of Utilities Commission

In this hearing upon a proposed amendment of a Utilities Commission rule defining and listing products which may be carried under a petroleum authority, there was competent, substantial and material evidence to support a finding by the Commission that the fact that the certificates of liquid petroleum carriers in bulk in tank trucks limit the transportation of petroleum products, other than gasoline, kerosene, fuel oils and naphthas, to originations from specified "originating terminals" renders it unlikely that such carriers would have the opportunity, under their existing petroleum authority, to transport many of the commodities listed either in the amendment supported by appellants or the amendment adopted by the Commission.

4. Carriers § 2; Utilities Commission § 3— rule defining petroleum products — finding of Utilities Commission

There was sufficient evidence to support the Utilities Commission's finding that adoption of the definition of "petroleum products" proposed by appellants would have the effect of granting new authority to a large number of petroleum carriers without a showing of public convenience and necessity.

Utilities Comm. v. Petroleum Carriers

**5. Utilities Commission § 6— hearings — informality**

Since the regulation of public utilities is a continuing and continuous process as to each utility, procedure before the Utilities Commission must be more or less informal and not confined by technical rules in order that regulation may be consistent with changing conditions.

**6. Utilities Commission § 6— enlargement or restriction of inquiry**

The Utilities Commission may enlarge or restrict the inquiry before it unless a party is clearly prejudiced thereby.

**7. Carriers § 2; Utilities Commission § 3— amendment to rule defining petroleum products — adequacy of notice**

In this hearing on a proposed amendment of a Utilities Commission rule defining and listing products which may be carried under a petroleum authority, appellant's contention that the Commission's adoption of an amendment introduced by appellees at the hearing, rather than the proposed amendment attached to the notice of hearing, restricted the authorities of appellants without adequate notice *is held* without merit, appellants having been given ample notice that appellees contended that many of the items listed in the proposed amendment were not true petroleum products and that adoption of the proposed list would enlarge appellants' authority without a hearing as to public convenience and necessity, and there being no evidence that appellants have transported or attempted to transport any commodity not included within the adopted amendment.

**8. Utilities Commission § 6— adoption of rules — finding of reasonableness**

In adopting a rule pursuant to G.S. 62-31, the Utilities Commission need not make a finding of fact that the rule is reasonable and necessary in order for it to administer and enforce the provisions of the Public Utilities Act.

**9. Evidence § 48; Utilities Commission § 6— admission of expert testimony — failure to find witness is expert**

In this rule making proceeding, the Utilities Commission did not err in the admission of expert opinion evidence without a specific finding that the witness was an expert, since the admission of the evidence over objection and the denial of a motion to strike constituted the Commission's ruling that the witness was qualified as an expert.

**10. Utilities Commission § 6— expert testimony—filing in advance**

In this rule making proceeding, a Utilities Commission rule did not require that the testimony of expert witnesses presented by appellees be in writing and filed with the Commission in advance, there being no testimony or exhibits of the complexity or nature described in the rule.

**11. Carriers § 2; Utilities Commission § 3— notice of proposed rule amendment — adoption of more restrictive amendment — adequacy of notice to nonparticipants in hearing**

In this hearing upon a proposed amendment to a Utilities Commission rule defining and listing products which may be carried

under a motor carrier petroleum authority, notice of the hearing with an attached copy of the proposed amendment constituted sufficient notice to carriers who did not participate in the hearing of the Commission's entry of a order amending the rule in a more restrictive manner than the amendment proposed and attached to the notice, where the Commission found upon competent evidence that the fact that the existing certificates of petroleum carriers limit the transportation of petroleum products, other than gasoline, kerosene, fuel oils and naphthas, to originations from certain specific "originating terminals" would render it unlikely that such carriers would ever have the opportunity, under their existing petroleum authority, to transport many of the commodities listed either in the proposed amendment or the amendment adopted by the Commission.

APPEAL by Intervenors in support of amendment from order of North Carolina Utilities Commission in Docket No. M-100, Sub 31, dated 4 January 1971.

This is a rule making proceeding instituted by the Utilities Commission on its own motion by its order dated 25 March 1970. The order was served on all intrastate certificated and permitted carriers of petroleum and petroleum products, liquid, in bulk in tank trucks, and notified them "that the Commission has under consideration the adoption of an amendment to Rule R2-37 of its motor carrier regulations as contained in Chapter 2 of the Rules and Regulations of the North Carolina Utilities Commission, as adopted in Docket No. M-100, Sub 1." A copy of the proposed amendment was attached to the order, and the carriers were advised "that any representations in favor of or against the proposed rule change must be submitted in writing (11 copies) to the Commission on or before April 20, 1970."

The order proposed to amend Group 3 of N.C.U.C. Rule R2-37, which is intended to describe the commodities which certificated and permitted carriers of petroleum and petroleum products, liquid, in bulk in tank trucks, may transport under the authority held by the carriers and granted by the Commission.

Group 3 of Rule R2-37 presently reads as follows: "Group 3. *Petroleum and Petroleum Products, Liquid, in Bulk in Tank Trucks.*—This group includes gasoline, kerosene, fuel oil, liquefied petroleum gas, toluene, toluol, xylene, xylol and other petroleum products in bulk in tank trucks."

The amendment proposed to be adopted read as follows: "Group 3. *Petroleum and Petroleum Products, Liquid, in Bulk*

*in Tank Trucks.*—This group includes gasoline, kerosene, fuel oil, liquefied petroleum gas, tuluol, xylene, and xylol and all commodities, except asphalt and asphalt cutback, listed under Appendix XIII to I.C.C. Ex Parte MC-45, *Descriptions in Motor Carrier Certificates,* 61 M.C.C. 209, as amended through March 15, 1970." Also attached to the order served was a list of petroleum and petroleum products as listed in Appendix XIII.

Appellants filed motions for intervention and statements in support of the adoption of the amendment. They alleged that the amendment would clarify those commodities which they as carriers could lawfully transport under their certificates and would not result in any enlargement of the Certificates of Operating Authority issued to those carriers presently authorized to transport petroleum and petroleum products, liquid, in bulk in tank trucks. Appellees filed motions in intervention and statements opposing the adoption of the amendment. They alleged that many of the commodities listed in the proposed amendment are not, in fact, petroleum or petroleum products and should not be included in the definition or listing of commodities under Group 3; and that if the amendment were adopted, the present carriers certificated to transport Group 3, Petroleum and Petroleum Products, would be granted the right to transport numerous commodities not within the contemplation of their certificates and without a showing of public convenience and necessity.

Appellants and appellees were represented at the hearing which was calendared for 29 April 1970, but, at the request of one of the appellees, continued to 29 July 1970. Evidence was presented by all parties. On 14 January 1971 the Commission issued its order which did not incorporate the proposed amendment to Group 3 originally proposed in the Commission's notice. Instead the Commission adopted a definition and list introduced at the hearing by the appellees. As adopted by the Commission, Group 3 reads as follows:

> *"Petroleum and Petroleum Products, Liquid, in Bulk in Tank Trucks.* Petroleum products are defined as those derived from the mainstream of the crude oil and natural gas, containing only the elements of carbon and hydrogen, and unaltered by the addition of any atom or atoms of elements other than those of said carbon and hydrogen.

Asphalt and asphalt cutback are not included in this group. The following named commodities are included in this group, together with any other commodities within the definition set out above:"

There followed a list of some 76 commodities. This list was a list introduced at the hearing by appellees (their Exhibit 2) as the only commodities which are petroleum products appearing on the proposed list of some 193 commodities which was proposed by the Commission under Appendix XIII.

Appellants filed exceptions and a motion for reconsideration and rehearing. The exceptions were overruled and the request for reconsideration and rehearing denied. Appellants filed exceptions and notice of appeal.

*Edward B. Hipp, Maurice W. Horne, and William E. Anderson for the North Carolina Utilities Commission.*

*Bailey, Dixon, Wooten and McDonald, by J. Ruffin Bailey and Ralph McDonald, for Intervenors in Support of Amendment, appellants.*

*R. Mayne Albright, for Public Transport Corporation, Intervenor in Opposition to Amendment, appellee.*

*Clawson L. Williams, Jr., for Central Transport, Inc., Maybelle Transport Company, and Chemical Leaman Tank Lines, for Intervenors in Opposition to Amendment, appellees.*

MORRIS, Judge.

The appellants first argue that the order adopted by the Commission is erroneous as a matter of law and is unsupported by competent, material, and substantial evidence in view of the entire record in that (a) the Commission failed to consider evidence that the definition was complex and difficult to apply, (b) the Commission failed to consider the national transportation policy and coordination of interstate and intrastate public utility services, and (c) the order was based upon the erroneous finding or conclusion that the amendment originally proposed would have enlarged the authorities of the appellants to the detriment of the appellees. Within this first argument and under (a) above, appellants contend that their exceptions to findings of fact Nos. 4 and 5 should be sustained. These findings are as follows:

"(4) That for the guidance of the motor carriers and of the shipping public a definition of petroleum products and a list of commodities included under such definition are urgently needed and in the public interest.

(5) That the commodities in the list submitted and received in evidence as Protestants' Exhibit 2, contain only the elements of hydrogen and carbon in one combination or another and are true petroleum products, which along with a definition of 'petroleum products' should be shown under Group 3 of Rule R2-37 to the end that authorized motor carriers and the shipping public may know what such carriers may legally haul in intrastate commerce in North Carolina."

[1] G.S. 62-94(e) provides that "Upon any appeal, the rates fixed or any rule, regulation, finding, determination, or order made by the Commission under the provisions of this chapter shall be prima facie just and reasonable." *Utilities Com. v. Mead Corp.*, 238 N.C. 451, 78 S.E. 2d 290 (1953). Section (b) of G.S. 62-94 provides that on appeal the court may reverse or modify the decision if *substantial rights* of appellant have been prejudiced because the Commission's findings, inferences, conclusions, or decision are unsupported by competent, material and substantial evidence in view of the entire record as submitted. The Commission staff testified—and their evidence in this respect was not contradicted—that confusion had existed with respect to Group 3 and that it had been necessary in the past to hold a hearing to determine whether a commodity for which a tariff had been filed was a petroleum product within the existing phraseology of Group 3 commodities. One staff member testified, in substance, that because of the confusion, the Commission directed its staff to make a study of the rules and present a recommendation with respect to an amendment to Group 3 which would more accurately and adequately describe petroleum and petroleum products. The staff did make a study and recommended that this rule making procedure be instituted for the purpose of adopting the proposed amendment to Rule R2-37, Group 3, as set out in the Commission's notice. The amendment as proposed would have included within the definition of petroleum and petroleum products, liquid, in bulk in tank trucks, all of those commodities, except asphalt and asphalt cutback, listed under Appendix XIII to I.C.C. Ex Parte MC-45, Descriptions

in Motor Carrier Certificates, 61 M.C.C. 209, as amended through 15 March 1970. There was evidence from the Commission staff to the effect that they had no strong feeling about the adoption of the proposed amendment. Mr. Killian testified: "As far as I am concerned, I consider it was just a starting point. I thought that we had to do something, and this is the best solution we could think of. We thought that, if we could get it started and get it into the hearing room, any bugs in it would come out." Mr. Hughes, of the Commission staff, testified that in his opinion the best rule which could be adopted by the Commission would be the one identical to the Interstate Commerce Commission's rule. Both Mr. Killian and Mr. Hughes testified that the proposed rule was just a list, would not furnish any means of classifying new products coming on the market, and the list would become obsolete in a few years. Both also testified that it possibly would be helpful to the Commission if it had or adopted a definition of petroleum and petroleum products in addition to having a list. There was testimony from an expert witness that it would be helpful for one to have some knowledge of chemistry in determining whether a new commodity would come within the definition; that a person "totally unschooled in chemistry or in science" would not be able to make that determination, but that a person with no more than one or two years of college chemistry "should certainly be able to make a decision of this sort"; that a person who is trained should be able to do it almost by inspection without reference to a reference book; that he should, as a minimum, have a course in organic chemistry which would be a sophomore year course; that there are handbooks available in most public libraries listing pure chemical compounds; and that if products "fell into the category of being from crude oil, then there are reference works which would tell which things come from crude oil, and then by use of a handbook, one could find immediately whether it had any element other than carbon or hydrogen." Another expert witness testified that the definition proposed by respondents would certainly put very definite limits on what are petroleum products and further: "Well, this certainly would be a rigorous definition. It could be very easily determined whether or not a product was a petroleum product within this definition . . . " This witness also testified that in his opinion it would be much easier, even for a person not trained in organic chemistry, to get the information and determine whether a product

would fit under the definition than to determine if it was on some list or could be made from petroleum. The evidence was uncontradicted that many of the items listed on the proposed Appendix XIII list were not true petroleum products, while the evidence of the chemists who testified was that the items listed on Protestants' Exhibit 2 contain only the elements of hydrogen and carbon and are, therefore, true petroleum products.

We think the Commission's findings of fact Nos. 4 and 5 are amply supported by competent, material, and substantial evidence.

[2] With respect to (b) above, appellants argue that the Commission's order was in obvious disregard of G.S. 62-2 and G.S. 62-259. G.S. 62-2 is entitled "Declaration of Policy." Among the ends sought to be achieved is "to cooperate with other states and with the federal government in promoting and coordinating interstate and intrastate public utilities services, and to these ends, to vest authority in the Utilities Commission to regulate public utilities generally and their rates, services and operations, in the manner and in accordance with the policies set forth in this chapter." G.S. 62-259 is entitled "Additional Declaration of Policy for Motor Carriers" and contains, among others, this further policy: "And to conform with the national transportation policy and the federal motor carriers acts insofar as the same may be practical and adequate for application to intrastate commerce." We do not perceive that either of these phrases *requires* the North Carolina Utilities Commission to adopt a rule of the Interstate Commerce Commission. Certainly the Commission must make its own independent investigations, determinations and findings of fact based upon the evidence presented to it. We find no merit in appellants' contention.

[3, 4] With respect to (c) above, appellants contend that finding of fact No. 6 was not supported by the evidence. The finding is:

"(6) That the existing petroleum authorities, including the authority contained in the certificates of carriers party to this proceeding, limit the transportation of petroleum products, other than gasoline, kerosene, fuel oils and naphthas, to originations from certain specified 'originating terminals,' generally pipeline and marine terminals, which fact would render it unlikely that these carriers would ever have

the opportunity, under their existing petroleum authority, to transport many of the commodities shown either in Appendix XIII or in. Protestants' Exhibit 2 for the reason that such commodities are not shipped from the said specified 'originating terminals.' "

Mr. Killian, of the Commission staff, testified that, although there was disagreement on the point between him and Mr. Hughes, it was his own opinion that when a certificate authorized "transportation of petroleum and petroleum products in bulk in tank trucks from existing originating terminals at or near" a place or places, it meant the petroleum terminal and does not mean "some chemical place or some fertilizer manufacturing place like Carolina Nitrogen down at Wilmington." There was also evidence that the commodities which are shipped through pipelines to existing terminals in North Carolina are gasoline, kerosene, and fuel oil. It is obvious that the Commission adopted this interpretation of the wording of the certificates issued by it as its own. Appellant also contends that there was no evidence to support the Commission's conclusion that adoption of Appendix XIII, the original proposed amendment, would have the effect of granting new authority to appellants and other petroleum carriers. There was no evidence that any product not conceded to be a true petroleum product had ever been transported by any of the appellants under their existing authority. The evidence was that they had transported under their authorities only the true petroleum products. There was evidence that to amend Group 3 to include commodities other than those which are true petroleum products would have the effect of granting new authority to a large number of existing petroleum carriers without a showing of public convenience and necessity. The first such evidence came from Mr. Hughes of the Commission staff: "As it stands now, under the Commission's interpretation, an intrastate carrier can't transport, under a certificate for petroleum products, anhydrous ammonia. If Appendix XIII were adopted, he could. This would probably be true of many other commodities contained in Appendix XIII. To that extent, it would give that intrastate carrier additional authority to what he now holds, without any showing of public convenience and necessity." This contention is also without merit.

Appellants next contend that the order entered by the Commission was erroneous as a matter of law because it (a) re-

stricted the authorities of appellants without the notice required by G.S. 62-43 and G.S. 62-80, and (b) failed to find or conclude, as required by G.S. 62-31, that the rule adopted was reasonable and necessary to enable it to administer and enforce the provisions of the Public Utilities Act. We find no merit in either position.

G.S. 62-43 authorizes the Commission, after notice and hearing, and upon its own motion or upon complaint, to ascertain and fix just and reasonable standards, classifications, regulations, practices, or service to be furnished, imposed, observed or followed by one or all public utilities. G.S. 62-80 provides:

> "The Commission may at any time upon notice to the public utility and to the other parties of record affected, and after opportunity to be heard as provided in the case of complaints, rescind, alter or amend any order or decision made by it. Any order rescinding, altering or amending a prior order or decision shall, when served upon the public utility affected, have the same effect as is herein provided for original orders or decisions."

Appellants contend that the notice given contained no indication that the existing rule might be restricted. They take the position that the order adopted changed the wording of the rule and adopted a restrictive definition, the effect of which is to deprive the appellants and other petroleum carriers of the right to transport commodities which they were authorized to transport under the existing rule.

[5-7] Since the regulation of public utilities is a continuing and continuous process as to each utility, procedure before the Commission must be more or less informal and not confined by technical rules in order that regulation may be consistent with changing conditions. The Commission may enlarge or restrict the inquiry before it unless a party is clearly prejudiced thereby. *Utilities Commission v. Area Development, Inc.*, 257 N.C. 560, 126 S.E. 2d 325 (1962). The evidence was uncontradicted that the Commission and the haulers had been experiencing difficulty with the existing rule. Staff testimony was that it was not the idea of the Commission that the proposed amendment was the only answer, but it was their thinking that it would be advisable to get the matter into hearing and try to work out something which would obviate the necessity for separate hearings

with respect to individual commodities as had been necessitated by the wording of the existing rule. That a classification proceeding would eventually be necessary was recognized in the order entered in Docket No. T-1277, Applications of Beard-Laney, Inc. et al, Fifty-Third Report of the North Carolina Utilities Commission July 1, 1962-December 31, 1963, p. 133. In that proceeding, a number of carriers had applied for amendment to their previously granted petroleum and petroleum products authority in such a manner as to allow them to transport "between all points and places within the State of North Carolina" rather than merely "from all existing originating terminals . . . to points and places throughout the State of North Carolina." There was evidence that hexane, transformer oil, waxes, xylol and coal spray oils are petroleum products. In its order the Commission said: "Be that as it may, *until such time as determination is made in a proper proceeding as to what family many of these items properly belong,* and in the absence of a showing at this time to the contrary, it seems ill-advised to grant authority for the transportation of them under the guise of petroleum products." (Emphasis supplied.) (p. 135.) The motions and pleadings filed by respondents in this proceeding gave ample notice that protestants took the position that many of the items listed on the Appendix XIII were not true petroleum products and, therefore, the adoption of the proposed list would enlarge appellants' authority without a hearing as to public convenience and necessity. Additionally there is no evidence that appellants had ever transported or attempted to transport any commodity other than those recognized and conceded to be true petroleum products. In previous hearings for classification of commodities, those allowed by the Commission were those found by it to be all hydrocarbons. Appellants received adequate statutory notice and they have shown no prejudice by the "enlargement of the inquiry" before the Commission.

[8] The General Assembly has given the Utilities Commission "full power and authority to administer and enforce the provisions of this chapter, and to make and enforce reasonable and necessary rules and regulations to that end." G.S. 62-31. We cannot agree with appellants' position that the Commission must, in enacting a rule under G.S. 62-31, set forth in its order findings of fact that the rule is reasonable and necessary in order for it to administer and enforce the provisions of the Act. This would be as much an exercise in futility as requiring the Com-

mission to find as a fact that its order, rule or regulation is not "arbitrary or capricious" or that it is based on "competent, material and substantial evidence in view of the entire record as submitted" as required by G.S. 62-94(b)(5) and (6). Indeed, G.S. 62-94(e) provides that "Upon any appeal, the rates fixed or any rule, regulation, finding, determination, or order made by the Commission under the provisions of this chapter shall be prima facie just and reasonable."

By their assignment of error No. 3, appellants contend that the Commission committed prejudicial error in admitting the opinion evidence of witnesses who had not been tendered or qualified as experts in violation of G.S. 62-65 and whose testimony had not been reduced to writing and filed with the Commission in advance as was required by its Rule R1-24(g).

Dr. Pelham Wilder, Jr., professor of chemistry at Duke University and professor of pharmacology at Duke University Medical School, testified as to his educational background in the field of chemistry and his experience of over 20 years in the field. He testified he had read the Commission's notice and had studied the list of commodities attached thereto, particularly relative to definitions of petroleum and petroleum products or to the nature of the materials included in the listing. He was then asked to give a definition of a petroleum product. Appellants objected to "his giving us a definition of petroleum products. He may give his determination of what a petroleum product consists of, but not to give a definition of the thing." The following transpired:

"CHAIRMAN WESTCOTT: This will be his definition.

BAILEY: He is not qualified, even if you would tender him as an expert to state that . . .

CHAIRMAN WESTCOTT: That will be the Doctor's definition.

WILLIAMS: Let me rephrase the question.

Q Do you have a definition of petroleum products satisfactory to yourself as a chemist?

OBJECTION: OVERRULED: EXCEPTION No. 13

A A definition that I would use, my own definition that I would use for petroleum products would be petroleum

products are defined as those products derived from the main stream of the crude oil and natural gas containing only the elements of carbon and hydrogen and unaltered by the addition of any atom or atoms of other than those of said carbon and hydrogen.

MOTION TO STRIKE: DENIED: EXCEPTION NO. 14."

G.S. 62-65 provides that *"When acting as a court of record,* the Commission shall apply the rules of evidence applicable in civil actions in the superior court, insofar as practicable, . . ."* (Emphasis supplied.)

[9] Conceding arguendo that in this administrative rule making procedure the Commission was "acting as a court of record," and conceding further arguendo that appellants' objection was an objection to Dr. Wilder's qualifications as an expert (rather than to his offering a definition "even if you would tender him as an expert"), the admission of the evidence and denial of the motion to strike constituted the court's ruling on the witness' qualifications as an expert. *Teague v. Power Co.,* 258 N.C. 759, 129 S.E. 2d 507 (1963). And "the absence of a record finding in favor of his qualification is no ground for challenging the ruling of the trial court in allowing him to testify." Stansbury, N. C. Evidence 2d, § 133, p. 317.

[10] Nor do we find any merit in the second contention embraced in this assignment of error. N.C.U.C. Rule R1-24(g)(1) and (2) requires that "The proposed initial direct testimony of an expert witness, including accountants, auditors and engineers, *in rate cases and in other proceedings involving detailed and complicated computations, audits, cost studies, appraisals, tables of figures, graphs, charts, drawings, and other exhibits of a similar nature,* shall be reduced to writing . . ." and filed with the Commission at least 60 days prior to the date set for hearing in general rate cases and at least 30 days prior to date set for hearing in all other cases. Appellants do not, of course, contend that this is a rate case. We find no testimony or exhibits of the complexity or nature described in the rule which would require reduction to writing or filing in advance of the hearing. This assignment of error is overruled.

Appellants filed with the Commission a motion for reconsideration and rehearing and excepted to the denial of the mo-

tion. This is assigned as error and constitutes assignment of error No. 5. The primary reason advanced for reconsideration and rehearing was the assertion that appellants were surprised by the admission of the expert testimony presented by appellees and should be given opportunity to present experts of their own. For reasons already stated in this opinion, this assignment of error is overruled.

Appellants' remaining assignment of error is formal and based on exception to the entry of order of 14 January 1971 amending Group 3 of its Rule R2-37. Conclusions reached in discussing appellants' contentions on appeal compel, of course, the overruling of this assignment of error.

[11] This Court *ex mero motu* ordered additional oral arguments on the question "Was the notice of Rule Making Procedure in Docket No. M-100, Sub 31, given by the Utilities Commission on 25 March 1970, to all intrastate certificated and permitted carriers of petroleum and petroleum products, liquid, in bulk in tank trucks, and interested carriers, notifying them of a proposed amendment to Rule R2-37 and of a hearing thereon at 9:30 a.m. on Wednesday, 29 April 1970, and attaching a copy of the proposed amendment, sufficient notice to carriers, who received that notice but did not participate in the hearing or appeal, of the entry of an order amending the rule in a more restrictive manner than the amendment proposed and attached to the notice of 25 March 1970?" The Commission found that the fact that the certificates of carriers party to this proceeding limit the transportation of petroleum products, other than gasoline, kerosene, fuel oils and naphthas, to originations from certain specified "originating terminals" would render it unlikely that these carriers would ever have the opportunity, under their existing petroleum authority, to transport many of the commodities shown either in Appendix XIII or in Protestants' Exhibit 2 for the reason that such commodities are not shipped from said specified "originating terminals." Having concluded, as we do, that there was sufficient competent, material and substantial evidence to support this finding, we conclude also that it follows, a fortiori, that under the circumstances of this case and as to the carriers who received notice but did not participate, statutory requirements of notice and due process requirements have been met.

In light of the conclusions reached, we deem it unnecessary to discuss the contention of the Commission that appellants are not parties aggrieved, have no right to appeal, and if the appeal be treated as a petition for certiorari it should be denied.

Affirmed.

Judges BRITT and PARKER concur.