STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION; CAROLINA POWER AND LIGHT COMPANY v. RUFUS L. EDMISTEN, ATTORNEY GENERAL

No. 39

(Filed 21 December 1976)

1. Utilities Commission § 6— meaning of "rate" ·

The word "rate" used in the Public Utilities Act refers not only to the monetary amount which each customer must ultimately pay but also to the published method or schedule by which that amount is figured.

2. Utilities Commission § 6— changes in rate methods or schedules — changes in amount paid by customer — procedures

While changes in the methods or schedules for determining what a customer must ultimately pay must be accomplished according to procedures outlined in the Public Utilities Act, changes in the ultimate monetary amount which each customer pays periodically need not be.

3. Electricity § 3; Utilities Commission § 6— fossil fuel adjustment clause — no change of rates without hearing

The use of a fossil fuel adjustment clause does not permit published rates of a utility to be changed from month to month without a new rate filing, notice or hearing in violation of provisions of the Public Utilities Act since it is the fuel clause, a formula for figuring certain monetary additions to or subtractions from a customer's bill, not the ultimate amount so figured, which constitutes that part of the utility's published schedule subject to the provisions of the Public Utilities Act.

4. Electricity § 3; Utilities Commission § 6— fossil fuel adjustment clause — no isolation of one cost element

The fossil fuel adjustment clause did not isolate only one element of cost without considering all other elements and without considering whether the formula, when used with the regular rate schedule, produces total rates which are just and reasonable as required by G.S. 62-131(a) since the clause was approved, not as an isolated event, but as an adjunct, or rider, to the utility's general rate schedules in which all elements of cost were duly considered.

5. Electricity § 3; Utilities Commission § 6— fossil fuel adjustment clause — rate of return — assumption

In considering whether a fossil fuel adjustment clause would ever, in fact, operate to increase a utility's rate of return, the Utilities Commission was entitled to act on the normal assumption in rate cases generally, there being no evidence to the contrary, that other costs of the utility would not decline but would probably increase or at least remain fairly constant.

6. **Electricity § 3; Utilities Commission § 6— fossil fuel adjustment clause — historical test period concept**

The use of a fossil fuel adjustment clause did not violate the historical test period concept embodied in former G.S. 62-133(c), although the Utilities Commission considered evidence and made findings based thereon that there had been a dramatic increase in the cost of fossil fuel both within the test period and extending for some time beyond it, since the Commission did not fix revenues to cover this increased expense but resorted to the fuel adjustment clause as a device which, operating flexibly, would increase the revenues or decrease them as a function of the cost of fossil fuel to the utility.

7. **Electricity § 3; Utilities Commission § 6— fossil fuel adjustment clause — no abdication of rate making powers**

The Utilities Commission did not abdicate its rate making powers by permitting use of a fossil fuel adjustment clause since the Commission provided for its continued monitoring of the operation of the clause.

8. **Electricity § 3; Utilities Commission § 6— fossil fuel adjustment clause — validity**

The Utilities Commission acted within its statutory authority in permitting an electric utility to utilize a fossil fuel adjustment clause as an adjunct, or rider, to its regular rate schedule.

9. **Electricity § 3; Utilities Commission § 6— fossil fuel adjustment clause — monitoring of performance**

The evidence was sufficient to support a finding by the Utilities Commission that its system of monitoring the operation of a fossil fuel adjustment clause will insure that the utility acts in accordance with sound management practices in its negotiations and will protect rate payers from the utility's recovering more than its operating expenses.

10. **Utilities Commission § 6— interim rate change — refusal to suspend change**

The Utilities Commission may permit rate schedule changes applied for by a utility to be placed into effect on an interim basis by refusing to exercise its power to suspend the change applied for or, having exercised it, by determining before the hearing to rescind the suspension in whole or in part. If the Commission does not suspend the rate change, it automatically goes into effect at the expiration of the 30 days' notice period provided for in G.S. 62-134(a).

11. **Utilities Commission § 6— rate change — placing in effect after six months**

Under G.S. 62-135, even if the Utilities Commission has timely suspended a rate change applied for by a utility, the utility may nevertheless place the rate change into effect upon the expiration of six months after the date such rates would have become effective, if not so suspended, by giving the statutory notice subject to certain provisos and subject to the utility's filing a surety bond or undertaking approved by the Commission conditioned upon a refund with interest of all rates finally determined to be excessive.

Utilities Comm. v. Edmisten, Attorney General

**12. Utilities Commission § 6— allowing rate applied for to become immediately effective**

Under G.S. 62-134(a) the Utilities Commission may by affirmative order *allow* applied for rate changes to become immediately effective conditionally or unconditionally.

**13. Electricity § 3; Utilities Commission § 6— interim fossil fuel adjustment clause — ex parte order — statutory authority**

The Utilities Commission acted within the authority granted it by G.S. 62-134(a) when it entered an *ex parte* order allowing a fuel adjustment clause sought by a utility to be placed in effect on an interim basis pending further hearing and final determination and when it entered a second interim order effectuating *ab initio* the utility's earlier proffered undertaking for refund.

**14. Electricity § 3; Utilities Commission § 6— interim fossil fuel adjustment clause — ex parte order — due process**

Utilities Commission's *ex parte* order allowing a fuel adjustment clause sought by a utility to be placed in effect on an interim basis did not violate the Law of the Land provision, N. C. Constitution, Art. I, § 19, or the Due Process Clause of the Fourteenth Amendment to the U. S. Constitution since due process rights of interested parties were protected by the subsequent hearings, the utility's refund undertaking, and the right of an interested party to challenge the rate change under G.S. 62-132.

Justice LAKE dissenting.

APPEAL by the Attorney General, Intervenor, pursuant to General Statute 7A-30(2) and (3) from a decision by a majority of a panel of the Court of Appeals. The Court of Appeals' opinion by *Parker, J.*, concurred in by *Clark, J.*, was filed May 5, 1976, and is reported at 29 N.C. App. 258, 224 S.E. 2d 219. *Martin, J.*, dissented.

*Rufus L. Edmisten, Attorney General, by Robert P. Gruber, Special Deputy Attorney General, and Jesse C. Brake, Associate Attorney, for Intervenor Appellant.*

*William E. Graham, Jr., Vice President & General Counsel, Carolina Power & Light Company, and Joyner & Howison, by Robert C. Howison, Jr., for Carolina Power & Light Company, Appellee.*

*Edward B. Hipp, General Counsel, and Wilson B. Partin, Jr., Assistant Commission Attorney, for the Utilities Commission, Appellee.*

EXUM, Justice.

In conjunction with a pending application for a general rate increase filed October 29, 1973, the utility on January 25, 1974, applied to the Commission for approval of the utility's use as an adjunct, or rider, to its regular rate schedules a fuel adjustment clause. On February 5, 1974, the Commission on the basis of the utility's application and before hearing entered an *ex parte* order permitting the utility to use the fuel adjustment clause on an interim basis pending a hearing and final determination. The Commission, after full hearing, entered on December 19, 1974, its order finally approving the use of the clause in principle and approving further all revenues collected under it on bills rendered through September 30, 1974. This order provided for continued monitoring of the utility's application of the clause to all bills rendered after September 30, 1974. The Attorney General, having intervened under General Statute 114-2 (8) on behalf of the using and consuming public, appealed to the North Carolina Court of Appeals assigning errors to the Commission's orders of February 5, 1974, and December 19, 1974, respectively. A majority of the Court of Appeals' panel hearing the matter affirmed the Commission.

On the Attorney General's further appeal to this Court two principal questions are presented for decision: Did the Utilities Commission exceed its statutory authority by permitting, after notice and full hearing, the utility to utilize a fuel adjustment clause as an adjunct, or rider, to its regular rate schedule? If not, did the Commission exceed its statutory authority by entering its *ex parte* order authorizing the utility to incorporate such a device on an interim basis pending a hearing and final determination? We hold that both questions are properly answered in the negative and affirm the decision of the Court of Appeals.

The fuel adjustment clause, when used as an adjunct to the utility's regular rate schedule, permits the utility to add to its regular charges to customers an amount which represents, in effect, any given customer's share of the amount by which the utility's fossil fuel cost, i.e., cost for coal, gas, and oil used to generate electricity, exceeds during a given current period its cost pre-established for an historical base period. The utility must also give a credit to customers under the terms of the fuel clause if the current cost of fuel falls below its cost during the

Utilities Comm. v. Edmisten, Attorney General

base period. The "clause" itself is nothing more than a relatively simple mathematical formula by which the utility computes the additional charges or credits.

Under the formula in question in this case the utility figures its total cost for fossil fuel actually burned for one month. The month used is the second preceding month to that for which the customer is being billed. The utility then figures what its cost for fossil fuel actually burned would have been during this second preceding month had it paid for the fuel at base period prices by multiplying the pre-determined base cost stated in terms of dollars per kilowatt hour by the total kilowatt hours generated by its fossil fuel plants during this second preceding month. The second figure is substracted from the first and the difference is divided by the utility's total kilowatt hour sales in the second preceding month. The result, after an adjustment for applicable state gross receipts taxes, is a factor stated in terms of dollars per kilowatt hour. This factor is then applied to each customer's bill by multiplying it by the number of kilowatt hours used by that customer *in the month for which he is being billed*. The result is either an added charge or a credit to that customer's bill.

The formula by which the factor is figured may be stated mathematically in this form:

$$F = \frac{E - (.00513 \times G)}{S} \times \frac{1}{1 - T} .$$

"F" is the factor. "E" is the burned fossil fuel cost for the second preceding month to the month on which the current bill is figured. "G" represents the total number of kilowatt hours generated by the utility's fossil fuel plants in the second preceding month which is multiplied by the base cost stated in terms of dollars per kilowatt hour. "S" represents the utility's total kilowatt hour sales in the second preceding month. "T" is the applicable state gross receipts tax rate.

A full statement of the facts by which these issues are presented is: On October 29, 1973, the utility applied for a general rate increase of approximately $48,394,744 or approximately 21 percent overall. It also asked for an interim rate increase of approximately $25,052,209 or approximately 11 percent overall pending final determination and subject to the utility's undertaking for refund. It suggested that a larger interim rate

increase than requested "would be justified because of currently sharply rising fossil fuel prices, which undoubtedly will . . . prevent the Company from realizing the previously authorized rate of return of 12% that the interim increase is designed to produce on the historic test period ended June 30, 1973," and alleged that the interim increase actually requested was, therefore, "absolutely essential . . . . " While the utility's application was based on figures derived from a test period ending June 30, 1973, it suggested that a more appropriate end of test period would be December 31, 1973. On November 9, 1973, the Commission suspended the proposed increases and advanced the test period to the year ending December 31, 1973.

After several interventions including that of the Attorney General were allowed, hearings on the request for the interim rate increase were held on December 19 and 20, 1973. On January 25, 1974, the Commission, by order, allowed an interim increase of $12,675,745 or 5.94 percent. In this order the Commission relied in part upon increases in fuel cost. In reducing the interim increase from that sought by the utility, however, the Commission found that the utility had used "actual test year fuel costs instead of properly annualized end of test year fuel cost." By utilizing an end of test year fuel cost and removing a $69,945,960 investment from the test year rate base which the utility had included, the Commission found that an interim increase of only 5.94 percent was proper. The interim increase was to become effective on bills rendered after February 25, 1974, for service rendered after January 25, 1974. The interim rate increase was made subject to the utility's undertaking for refund which was approved by the Commission.

On January 25, 1974, the same day upon which the Commission entered its order permitting the interim increase, the utility applied for approval of the fuel adjustment clause as above described to be effective on bills rendered on and after March 1, 1974. Attached to this application was the utility's undertaking for refund with interest of all amounts collected under the fuel clause which may later be found to exceed rates finally determined to be just and reasonable. This application recited pendency of the application for an ultimate and interim general rate increase, hearings on the latter, and that an order was "being awaited." The application further alleged in summary: Earnings had declined dramatically during the last calendar year. In the *request* for an interim rate increase no increase in

the cost of fossil fuel over its cost during the test year ending June 30, 1973, was taken into account. Fuel cost, in the meantime, had skyrocketed to unprecedented extremes and further increases during 1974 were expected. Fossil fuel cost was by far the greatest operating expense of the utility having accounted for 57 percent of this expense during 1973. If the company was to continue to have reasonable earnings and provide adequate service, it must be permitted to recover its rapidly rising fuel cost in addition to receiving the ultimate and interim general rate increase already requested. It asked that a base cost of fossil fuel be used which reflected the utility's cost during the twelve months period ending on June 30, 1973. The base cost suggested by the utility was $.00481 per kilowatt hour, which it said was "the actual cost of fossil fuel burned in CP&L's plants in the twelve months' period which ended on June 30, 1973, and reflects a heat rate of 9,899 BTU's."

To this application the utility attached affidavits which explained the operation of the fuel clause and which attested to the recent dramatic rise in fuel costs. By affidavit a vice president of the utility testified to estimates that the cost of fossil fuel actually burned for 1974 would increase 55 percent over similar cost during the test period; that coal on the spot market had gone from $8.50 per ton in August, 1973, to over $25.00 per ton in January, 1974; and that oil prices were up 100 percent since October, 1973.

On February 5, 1974, the Commission on the basis of the utility's application and documents attached thereto found and concluded essentially that the fossil fuel market was unstable and likely to remain so for some future time; that the utility could not absorb the rapid increases in its fuel cost being currently experienced without impairment of its ability to provide adequate and reasonably priced electric service; that the fuel clause proposed was designed to return to the utility only its increased expenditures for fossil fuel and would not result in an increase in the rate of return previously approved by the Commission; and that "good cause" had been shown for immediate implementation of the fuel clause. The Commission, however, found that the proper base cost should be determined by calculating the utility's fuel cost for the month of June, 1973, and using the average heat rate for fossil fuel generation during the test period. It calculated this as $.5178 per million BTU's which when multiplied by the average test year heat

rate of 9899 BTU's per kilowatt hour resulted in a base cost of $.00513 per kilowatt hour. The Commission thereupon entered its *ex parte* order which provided in part:

> "That effective on service rendered on and after February 6, 1974, with respect to fossil fuel burned on and after December 1, 1973, the Applicant, Carolina Power and Light Company, is authorized and permitted to put into effect a fossil fuel cost adjustment clause of the type attached to its application as Exhibit B, Rider No. 32, altered to reflect a base cost of $.00513/KWH instead of the requested base cost of $.00481/KWH."

It ordered further that: (1) the utility report to the Commission on a monthly basis the amount of the fuel cost adjustment and the factors and computations used in its derivation and (2) the fuel clause application be consolidated with the utility's already pending application for a general rate increase for "further review and final disposition of a fuel cost clause as a part of the consideration of all rates of CP&L."

On February 22, 1974, the utility filed application for an additional general interim rate increase of 5.06 percent (the difference between the 11 percent interim increase sought initially and the 5.94 percent which the Commission initially allowed) alleging:

> "Even with the interim 5.94% and fuel clause adjustment, the earnings per share, return on equity and coverage of fixed charges will continue to decline rapidly through June, 1974, and thereafter without rate relief, seriously jeopardizing the financial stability of the Company and in particular, threatening its ability to market successfully $125,000,000 First Mortgage Bonds in May, 1974, after coverage has fallen below 2 times at the end of April. These sharply reduced comparative figures are shown below:

> "With ONLY the 5.94% interim and fossil fuel adjustment clause:

|  | *April* | *May* | *June* |
|---|---|---|---|
| 1. Earnings Per Share 12 months ended | $2.15 | $2.00 | $1.91 |
| 2. Return on End of Period Equity | 8.70% | 8.15% | 8.07% |

Utilities Comm. v. Edmisten, Attorney General

3. Coverage of Fixed Charges ____ 1.98X     1.89X     1.83X

"With 5.94% interim and fossil fuel adjustment clause, AND AN ADDITIONAL 5.06% INTERIM EFFECTIVE ON SERVICE RENDERED BEGINNING MARCH 1:

|  | *April* | *May* | *June* |
|---|---|---|---|
| 1. Earnings Per Share 12 months ended _____ | $2.18 | $2.06 | $1.99 |
| 2. Return on End of Period Equity _____ | 8.81% | 8.36% | 8.40% |
| 3. Coverage of Fixed Charges ___ | 2.00X | 1.91X | 1.87X" |

On March 4, 1974, the Attorney General filed a "Notice of Appeal" to the Commission's February 5, 1974, interim order together with certain exceptions thereto. Simultaneously he also moved that the Commission *either* postpone the effective date of the order pending judicial review or the Commission's own investigation and hearing *or* modify the order to require an undertaking for refund pending final determination. The Commission, on March 13, 1975, after noting that the utility had filed with its application an undertaking for refund, allowed the motion to provide for an undertaking for refund and approved the utility's undertaking already filed. The Attorney General's appeal was dismissed on motion of the Commission by the Court of Appeals, by an unreported order, Court of Appeals No. 7410UC539; and an appeal from this order and an application for further review thereof by this Court were dismissed and denied, respectively, in an unreported order to which Lake, J., dissented. Supreme Court No. 75, Fall Term 1974. For reported decisions dismissing similar appeals from interim fuel clause orders in cases involving Duke Power Co., and Virginia Electric and Power Co., see, respectively, *Morgan, Attorney General v. Power Co.*, 22 N.C. App. 497, 206 S.E. 2d 507 (1974), *appeal dismissed and cert. denied*, 285 N.C. 759, 209 S.E. 2d 282 (1974) (Lake, J., dissenting), and *Morgan, Attorney General v. Power Co.*, 22 N.C. App. 300, 206 S.E. 2d 338 (1974), *appeal dismissed and cert. denied*, 285 N.C. 758, 209 S.E. 2d 282 (1974) (Lake, J., dissenting).

On April 1, 1974, after notice and hearing, the Commission found facts, concluded that good cause for permitting the additional interim increase existed, and ordered an additional interim increase of 5.06 percent to be "effective for service ren-

dered on and after April 1, 1974," subject to the utility's undertaking for refund.

Whether the fuel clause should be finally approved came on before the Commission for full hearing beginning July 9, 1974, and was heard together with the utility's application for a general rate increase. Seven witnesses testified regarding the appropriateness of using a fuel clause. Four were offered by the utility, one by the North Carolina Textile Manufacturers Association, Inc., an intervenor at that stage of the proceeding, and two by the Commission itself.

The testimony of the witnesses for the utility tended to show the following: Approximately 73 percent of the utility's generating capacity at the end of 1973 came from plants that burned fossil fuel. The oil and coal markets, marked by price increases of unprecedented frequency and magnitude, were described as "chaotic." The cost of the utility's spot purchases (purchases not under contract) of coal between November, 1973, and March, 1974, increased 143.7 percent. The price of oil rose from $2.96 per barrel in January, 1973, to $5.73 per barrel by the year's end. In January, 1973, the utility's total fossil fuel cost was 47.8 cents per million BTU. In March, 1974, this cost had increased to 78.25 cents per million BTU. Each one cent increase in the cost of fossil fuel per million BTU translates to a two million dollar increase in overall fuel cost. The fuel clause proposed is based on differences in the cost per kilowatt hour of fossil fuel actually burned rather than on the price paid by the company for its fuel in gross. Thus changes in total efficiency of the utility's fossil fuel generating plants, or the utility's heat rate (the number of BTU's required to produce a kilowatt hour of current), are automatically reflected in the clause.

The Commission's staff engineers testified regarding the relative advantages and disadvantages of the fuel clause. The upshot of their testimony was that this type of fuel clause, which accounts for operating efficiency, accompanied by appropriate monitoring of its application by the Commission would eliminate most, if not all, of the disadvantages. Overall they felt it an appropriate device to use in the rate making process under the facts presented.

The witness offered by the North Carolina Textile Manufacturers Association did not contest the appropriateness of

Utilities Comm. v. Edmisten, Attorney General

the fuel clause in principle. His opinion was, rather, that the utility should not be permitted to pass on to its customers *100 percent* of its increased fuel cost. He urged that the clause should be adjusted so that only 90 percent of the increase would be recovered. He conceded, however, that if the evidence demonstrated that the utility had exercised sound business judgment in purchasing fuel, 100 percent recovery of its increased fuel cost would be appropriate. In this connection all of the testimony tended to show that the utility had done as well or better than any other utility in purchasing fuel at the cheapest prices available.

On November 4, 1974, the Attorney General filed a complaint in which he alleged that the utility's coal purchasing procedures and policies were marred by poor judgment. He asked the Commission to institute formal proceedings to investigate these procedures and policies which had been in effect since January 1, 1974. This complaint had been preceded by a conference, held on the Commission's own motion, between the Commission and its staff relative to increasing the Commission's surveillance of the fuel purchasing practices of Duke Power Co., Virginia Electric Power Co., and CP&L, all of whom were then utilizing fuel adjustment clauses. Because of these events, the Commission on November 27, 1974, ordered, *inter alia,* that the fuel clause application be severed for further consideration and monitoring from the general rate increase application.

On December 19, 1974, the Commission entered its order finally approving the fuel clause in principle. It found facts, in summary, as follows: The largest single item of expense for the utility in 1973 was fossil fuel used for electric generation. The average "burned" price of coal (the principal fuel consumed) increased from 46.79 cents per million BTU in January, 1973, to 92.5 cents per million BTU in June, 1974. Oil increased from 49.16 cents per million BTU in January, 1973, to 176.84 cents per million BTU in March, 1974. Total burned fossil fuel costs of the utility increased from 47.8 cents per million BTU in January, 1973, to 78.25 cents per million BTU in March, 1974. These increases cannot be recovered under the utility's regular rate schedules without further deterioration of earnings before general rate cases can be filed and ultimately determined unless an automatic adjustment for them is permitted. The utility had been unable to earn the return on its common equity found by the Commission to be fair and reason-

able largely because of the sharp rise in the cost of fossil fuel. One hundred ninety-six privately owned electric utilities in forty-three states had fuel adjustment clauses in operation in their rate schedules. The reasonable base cost for the utility's fuel clause was $.00513 calculated with the same figures and method used in the interim order. The fuel clause is a reasonable method by which the utility can recover part of its reasonable operating expenses.

There was no exception to any of these findings of fact by any intervenor.

The Commission then concluded that it was compelled to allow the utility to recoup the large increases in fossil fuel cost in a "just and reasonably expeditious and orderly manner, for to do otherwise would imperil [the utility's] ability to operate and provide service." It further concluded that: (1) a fuel clause should be made a part of the general rate schedules to be fixed by the Commission pursuant to General Statute 62-133; (2) inasmuch as General Statute 62-133(b)(5) requires rates to be fixed that will enable the utility to earn in addition to reasonable operating expenses a rate of return which produces for it a fair profit, the Commission should determine the reasonableness of the utility's operating expenses so that the fuel clause would not increase the utility's rate of return but would merely slow attrition of the rate of return; (3) it would fix a rate of return and determine the reasonableness of the utility's operating expenses in the general rate case which had been by order separated from the fuel clause case for purposes of decision and further monitoring; (4) its system of monitoring the operation of the fuel clause would insure that the utility applied sound management practices in its purchases of fossil fuel.

The Attorney General excepted to each of these conclusions.

Upon these findings and conclusions the Commission ordered that: (1) the fuel clause which had been earlier approved on an interim basis be finally approved; (2) all revenues collected under it through September 30, 1974, were approved; (3) the undertaking for refund for all revenues collected through September 30, 1974, was discharged; (4) a further hearing would be held on January 30, 1975, in which the application of the clause and the fossil fuel purchasing procedures and policies of the utility would again be reviewed. The utility was ordered to continue to file with the Commission monthly re-

ports showing the utility's computations under the fuel clause and the utility's periodic purchases of and prices paid for fossil fuel.

On January 6, 1975, the Commission entered its final order in the general rate case which approved the entire increase applied for by the utility including all interim increases already allowed. In this final order fixing the general rate schedules of the utility, the Commission used the same base cost of fossil fuel, $.00513 per kilowatt hour, as it used in the fuel clause.

I

In his exceptions and assignments of error to the December 19, 1974, order the Attorney General contends essentially that notwithstanding the economic advisability of a fossil fuel adjustment clause and the demonstrated need of the utility for the economic relief which the clause would provide, the Commission simply had no statutory authority to use the clause as a rate making device for these reasons: (1) The clause permits published rates to be changed automatically from month to month without notice, filing of new rate schedules, investigation or hearing by the Commission as required by provisions of the Public Utilities Act. (2) The clause isolates only one element of cost without considering all other elements and without considering whether the formula, when used with the regular rate schedule, produces total rates which are just and reasonable as required by General Statute 62-131(a). (3) The Clause violates the historical test period concept embodied in General Statute 62-133(c) before it was amended by 1973 Session Laws, Chapter 1041. (4) Use of the formula amounts to an unlawful abdication of the Commission's statutory rate making powers to private business enterprise and parties not under the control of the Commission.

We do not find the reasons advanced by the Attorney General persuasive. Neither do we find in the applicable provisions of the Public Utilities Act anything which prohibits the use of this fossil fuel adjustment clause in the context of the factual circumstances which the utility and the Commission faced in this case. Rather we discern in the Act provisions which when properly interpreted authorize, at least by implication and analogy, such a device. Our conclusions are supported by our cases and those from other jurisdictions.

[1-3] We first examine the reasons, set out above, advanced by the Attorney General for rejecting use of the fuel clause. While the clause does permit monetary additions to the monthly bills of customers without a new rate filing, notice, or hearing, it clearly does not permit any change in the utility's published *schedule of rates.* The clause itself when approved becomes part of the published schedule. " 'Rate' means every compensation, charge, fare, tariff, *schedule,* toll . . . demanded, observed, charged or collected by any public utility, for any service product or commodity offered by it to the public, and any *rules, regulations, practices* or *contracts affecting* any such compensation, charge, fare, tariff, schedule, toll, rental or classification." G.S. 62-3 (24). (Emphasis added.) Thus the word "rate" used in the Public Utilities Act refers not only to the monetary amount which each customer must ultimately pay but also to the published method or schedule by which that amount is figured. Changes in these methods or schedules must be accomplished according to the procedures outlined in the Public Utilities Act. Changes in the ultimate monetary amount which each customer pays periodically need not be. It is, therefore, the fuel clause, a formula for figuring certain monetary additions or subtractions to a customer's bill, not the ultimate amount so figured which constitutes that part of the utility's published schedule subject to the provisions of the Public Utilities Act.

> "The proposed escalator clause is nothing more or less than a fixed rule under which future rates to be charged the public are determined. It is simply an addition of a mathematical formula to the filed schedules of the Company under which the rates and charges fluctuate as the wholesale cost of gas to the Company fluctuates. Hence, the resulting rates under the escalator clause are as firmly fixed as if they were stated in terms of money." *City of Norfolk v. Virginia Electric and Power Co.,* 197 Va. 505, 516, 90 S.E. 2d 140, 148 (1955).

[4] While the clause does indeed isolate for special treatment only one element of the utility's cost, it was here approved *only as an adjunct, or rider, to the utility's other general rate schedules which the Commission had simultaneously under consideration.* The Commission approved the clause not as an isolated event but as a rider to general rate schedules in which all elements of cost were duly considered. The regular rate schedule finally approved by the Commission is designed to recover the

utility's fuel expense only at the same base cost used in the fuel clause. Fuel cost in excess of the base cost will be recovered only through the fuel clause rider.

[5] It is theoretically true, of course, that use of the fuel clause during a period when the utility is experiencing reduced costs in other areas may "automatically" increase the utility's approved overall rate of return. Such an event is always a possibility even without a fuel clause. The possibility exists not because of the fuel clause but because rate schedules are established essentially on the basis of known past experience and estimates of what will probably occur in the future. Any time the Commission overestimates future costs, the utility will earn more than its approved rate of return, all else remaining equal, so long as the schedules remain unchanged. Here the Commission, while approving the fuel clause, expressly recognized that it would have to base the utility's other rate schedules on a level of operating expenses such that the fuel clause "will not increase CP&L's rate of return, but will merely slow attrition of the rate of return" in the general rate increase aspect of this case. Apparently it proceeded to do so in its general rate order entered January 6, 1975. In considering whether the fuel clause would ever, in fact, operate to increase the utility's rate of return, the Commission was entitled to act on the normal assumption in rate cases generally, there being no evidence to the contrary, that other costs of the utility would not decline but would probably increase or at least remain fairly constant. Cf. *Utilities Commission v. Morgan, Attorney General, supra,* 278 N.C. 235, 179 S.E. 2d 419 (holding that the Commission, in fixing rates, may consider general inflationary trends). In the unlikely event that other costs of the utility should decline, the Commission, either on its own motion or that of another interested party, has plenary authority to intervene and make corrections in the utility's rate schedules including, if circumstances should require it, the abrogation of the fuel clause. G.S. 62-130(d) ; 62-136(a). There was testimony, largely uncontradicted, that the Commission regularly monitors the rates of return of each utility and that with this monitoring process the danger of an increase in the rate of return set by the Commission "is minimized almost beyond consideration." This Court speaking through Justice Lake, recognized in *Utilities Commission v. Morgan, Attorney General,* 278 N.C. 235, 239, 179 S.E. 2d 419, 421 (1971), that "[i]t is impossible to fix rates which will give the utility each day a fair return, and no more,

upon its plant in service on that day. The best that can be done, both from the standpoint of the company and from the standpoint of the person served, is to fix rates on the basis of a substantial period of time. Otherwise, rate hearings and adjustments would be a perpetual process."

[6] The Attorney General argues further that "[u]nder the historical test period concept which was in effect for the purposes of the present case [before the 1973 amendment, 1973 Session Laws, Chapter 1041], changes in operating expenses occurring outside the test period could not be made the basis of adjustments to the revenue requirement for rate making purposes. *Utilities Commission v. Virginia Electric and Power Co.,* 285 N.C. 398, 416, 206 S.E. 2d 283 (1974)." Apparently the Attorney General is arguing that the Commission must assume the utility's operating expenses will remain the same as they were during the test period in setting rates for some future period. This is not the law. Rate schedules are set with an eye no less toward the future than to the past. General Statutes 62-133(b)(2), (b)(3) and (c) contemplate that the Commission will consider "probable future revenues and expenses" in setting rates for the future. "Obviously, conditions do not remain static." *Utilities Commission v. Morgan, Attorney General,* 278 N.C. 235, 237, 179 S.E. 2d 419, 420 (1971). The company's experience during the test period regarding revenues produced and operating expenses incurred "is the basis for a reasonably accurate estimate of what may be anticipated in the near future if, but only if, appropriate *pro forma* adjustments are made for abnormalities which existed in the test period and for changes in conditions occurring during the test period . . . . " *Utilities Commission v. City of Durham,* 282 N.C. 308, 320, 193 S.E. 2d 95, 104 (1972). "Rate making is, of necessity, a matter of estimate and prediction since rates are set for the future." *Id.* at 321, 193 S.E. 2d at 104. Estimates regarding probable future revenues and expenses, however, must be based upon the utility's plant and equipment actually in operation at the end of the test period. G.S. 62-133(c); *Utilities Commission v. Morgan, Attorney General,* 277 N.C. 255, 273, 177 S.E. 2d 405 (1970), *affirmed on rehearing,* 278 N.C. 235, 179 S.E. 2d 419 (1971).

The Commission in its interim order on February 5, 1974, did consider dramatic increases in the price of fossil fuel which had occurred from sometime in 1973 to January, 1974. The test

year as set by the Commission ended December 31, 1973. As a basis for its final order entered December 19, 1974, the Commission again apparently considered increases in the price of fossil fuel from sometime in 1973 to March and June, 1974. Its findings were, in part, based on the cost of fossil fuel in March and June, 1974. There was no objection to this evidence and no exception noted to these findings.

We do not believe, furthermore, that the historical test period concept precluded the Commission from considering this kind of evidence. This Court did hold in *Utilities Commission v. Power Company*, 285 N.C. 398, 417, 206 S.E. 2d 283, 297 (1974), relied on by the Attorney General, that it was not error for the Commission to refuse to consider salary, wage, and federal social security tax increases known in the test period to be forthcoming but not taking effect until after the end of the test period, saying,

> "Adjustments for post test period increases in certain categories of expense may well give a distorted picture of the need for revenue since post test period experience in other categories of expense is not known and the possibility of offsetting adjustments is not precluded. As a practical matter, there must be a cutoff date for the making of adjustments."

We do not construe this holding to have precluded the Commission here even under the historical test period concept in effect at the time, from considering any post test period changes in expenses or revenues in trying to set future rates. General Statute 62-133 (d) expressly authorizes the Commission to consider "all other material facts of record that will enable it to determine what are reasonable and just rates." This Court held in *Utilities Commission v. Morgan, Attorney General,* 278 N.C. 235, 238-39, 179 S.E. 2d 419, 421 (1971), that the Commission could take into account the future effect of inflation by fixing rates "slightly in excess of that which is necessary to meet the . . . test of reasonableness." We need not now, in any event, explore fully the implications of this Court's decision in *Utilities Commission v. Power Co., supra.* The Legislature in 1975 amended the historical test period concept by substituting in lieu of the second sentence of General Statute 62-133 (c) the following:

> "The test period shall consist of 12 months' historical operating experience prior to the date the rates are proposed

to become effective but the Commission shall consider such relevant, material and competent evidence as may be offered by any party to the proceeding tending to show actual changes in costs, revenues, or the value of the public utility's property used and useful in providing the service rendered to the public within this State which is based upon circumstances and events occurring up to the time the hearing is closed." 1975 Session Laws, Chapter 184.

This amendment became effective on April 30, 1975, but was not to affect pending litigation.

Suffice it to say that the thrust of the evidence offered and considered by the Commission and the Commission's findings based thereon was that there had been a dramatic increase in the cost of fossil fuel both within the test period and extending for some time beyond it. The Commission did not fix revenues to cover this increased expense. Rather it resorted to the fuel adjustment clause as a device which, operating flexibly, would increase the revenues or decrease them as a function of the cost of fossil fuel to the utility. Thus even if our holding in *Utilities Commission v. Power Company, supra,* is interpreted to mean that under the traditional historical test period concept increases in post test period expenses may not be considered by the Commission in fixing revenues needed to cover them, the case is nevertheless readily distinguishable in principle.

[7] We also reject the Attorney General's assertion that the Commission has abdicated its rate making powers by permitting use of the fuel clause. By the very terms of the order permitting its use the Commission provided for its continuing monitoring of the operation of the clause. Both the interim and the final order required the utility to report to the Commission monthly "the amount of the fuel cost adjustment and the factors and computations used in its derivation" on a form prescribed by the Commission and appended to its order. In its final order approving the clause in principle, the Commission provided for continuing investigation (including another hearing scheduled at that time for January, 1975) "into the application of the clause and the fossil fuel purchasing procedures and policies of CP&L to the extent that they affect the fossil fuel adjustment factors applied to bills rendered after September 30, 1974." This provision of the order was in part a response of the Commission to a complaint filed by the Attorney General in November,

1974, alleging poor judgment in the utility's purchasing procedures and policies. As we have already indicated the Public Utilities Act empowers the Commission on its own motion or that of any interested party, including the Attorney General, to investigate the rates of the utility at any time and to alter them if it finds them to be "unjust, unreasonable, insufficient or discriminatory, or in violation of any provision of law." G.S. 62-136(a).

[8] Clearly there is nothing in the Public Utilities Act which expressly prohibits the use of a fossil fuel adjustment clause. We believe the Act contains provisions broad enough to authorize the Commission to permit such a device under the circumstances of this case. The ultimate duty of the Commission is to fix rate schedules which are "just and reasonable." G.S. 62-130. In performing its duty the Commission must follow General Statute 62-133 upon which this Court has expounded many times. While the Commission is limited, particularly by subsection (b), to a consideration of certain ultimate facts, it may consider many other evidentiary facts relevant thereto which may not be specifically listed in this section. Subsection (d) expressly empowers the Commission to "consider all other material facts of record that will enable it to determine what are reasonable and just rates." We held, for example, in *Utilities Commission v. Morgan, Attorney General, supra*, 277 N.C. 255, 177 S.E. 2d 405, that one such material fact the Commission may consider is serious inadequacy of service provided by the utility.

> " 'The right to consider "all other facts" is not a grant to roam at large in an unfenced field. The Legislature properly understood that, at times, other facts may exist, bearing on value and rates, which the Commission should take into account in addition to those specifically detailed in G.S. 62-124 [now 62-133]. However, it was contemplated that such facts be established by evidence, be found by the Commission, and be set forth in the record to the end the utility may have them reviewed by the courts.' " *Utilities Commission v. Public Service Co.*, 257 N.C. 233, 237, 125 S.E. 2d 457, 460 (1962).

The facts and findings based thereon upon which the Commission concluded that the fuel clause was a permissible adjunct to the utility's regular rate schedules are fully set out in this

record. The Commission, cognizant of its primary duty to fix just and reasonable rates, found upon uncontradicted evidence that the only way it could perform this duty under the facts was to permit use of the fuel clause.

Use of the fuel clause as an adjunct, or rider, to rate schedules has long been a practice of the Utilities Commission. While the question of its statutory legitimacy has never been squarely presented to this Court, we have had occasion to consider other questions involving the Commission's use of the clause and have, implicitly at least, approved it in principle as a rate making device. *Utilities Commission v. Area Development, Inc.*, 257 N.C. 560, 126 S.E. 2d 325 (1962); *Utilities Commission v. Light Co.* and *Utilities Commission v. Carolinas Committee*, 250 N.C. 421, 109 S.E. 2d 253 (1959); *Utilities Commission v. Municipal Corporations*, 243 N.C. 193, 90 S.E. 2d 519 (1955).

According to the evidence some 42 states in addition to North Carolina use such clauses in their utility rate making schemes. The fuel clauses have been uniformly approved by courts which have considered them. In *Montana Consumer Council v. Public Service Commission*, 541 P. 2d 770, 775 (Montana 1975), the Montana Supreme Court, construing statutes similar to ours, said:

"A majority of states in which the question has been presented has upheld the validity of similar provisions in utility rate orders variously designated as 'automatic adjustment clauses', 'escalator clauses', 'purchased gas adjustment clauses', and 'pass through' procedures. These decisions have been made under a wide variety of state utility laws, divers kinds of clauses and procedures, and particular circumstances. Examples of decisions upholding their validity: *City of Norfolk v. Virginia Electric and Power Company* (1955), 197 Va. 505, 90 S.E. 2d 140; *City of Chicago v. Illinois Commerce Commission* (1958), 13 Ill. 2d 607, 150 N.E. 2d 776; *United Gas Corp. v. Mississippi Public Service Commission*, (1961), 240 Miss. 405, 127 So. 2d 404; *City of El Dorado v. Arkansas Public Service Commission* (1962), 235 Ark. 812, 362 S.W. 2d 680; *Maestas v. New Mexico Public Service Commission* (1973), 85 N.M., 571, 514 P. 2d 847, which includes a compilation of decisions approving the use of such clauses.

"In our view the underlying justification for the use of 'automatic adjustment clauses' and procedures lies in the realities of the market place. As the cost of purchased gas and royalty expense of the utility rise or fall, a corresponding increase or decrease in the prices charged its customers must occur. Otherwise the utility will either be driven out of business or it will reap windfall profits. Today, in a period of rapid increases in costs of these items to the utility, the former consideration is paramount; at another time, the situation may be reversed and the latter may be the principal concern. Automatic adjustment clauses and procedures are simply a means whereby rapid fluctuations in these costs to the utility can be reflected in equally rapid and corresponding changes in prices charged the utility's customers."

In *Consumers Organization for Fair Energy Equality, Inc. v. Department of Public Utilities*, 335 N.E. 2d 341, 343-46 (Mass. 1975) reason and authority were collected and the Supreme Judicial Court said:

"Fuel adjustment clauses have appeared in electric utility rate schedules in this country for many years. A need for them was felt during the first World War and they have been with us ever since, although the wisdom of their use has been regularly a subject of controversy. Such a clause provides typically for the fluctuation upward or downward of the rates charged to customers reflecting, in accordance with formula, changes from a defined base in the cost to the company of the fuel used by it to generate power. It is a 'pass-through' provision operating in terms of a mathematical formula.

. . . .

"Rate proceedings have been notoriously slow as well as expensive. In times of inflation, dependence on lumbering rate proceedings to accommodate the rates to rapidly increasing costs would threaten utilities with unrecoverable expenditures destructive of reasonable returns. Therefore the demand arose to build into the rates, provisions by which increases in certain costs to the utilities (and, to be fair, decreases as well) would in accordance with formula be automatically passed on to the consumers as fluctuations of the charges to them, without the burden and expense to

utilities—which would ultimately fall upon consumers—of instituting and carrying out separate rate proceedings to justify the varying charges. Automatic adjustment made particular appeal where the utility had only minimal bargaining power about the particular items of cost (e.g., a gas company purchasing natural gas from a supplier whose rates were fixed by the Federal Power Commission), or where the State regulatory agency believed it could keep a close watch on the particular costs (e.g., an electric company purchasing coal or oil to generate power, the purchase contracts being under continual effective scrutiny by the State agency). See *Chicago v. Illinois Commerce Commn.*, 13 Ill. 2d 607, 614-616, 150 N.E. 2d 776 (1958); *Re Providence Gas Co.*, 88 P.U.R. 3d 430, 433-434 (R.I. Pub. Util. Commn. 1971).

.   .   .   .

"Lastly, we observe that authority in other States is consistent with and supports the basic position that fluctuations of charges to consumers under a cost adjustment clause are not, in the characteristic legislative pattern, changes in the schedule of rates invoking rate proceedings with any incident hearings. See *Chicago v. Illinois Commerce Commn., supra; United Gas Corp. v. Mississippi Pub. Serv. Commn.*, 240 Miss. 405, 127 So. 2d 404 (1961); *Akron v. Public Util. Commn. of Ohio*, 5 Ohio St. 2d 237, 215 N.E. 2d 266 (1966); *Norfolk v. Virginia Elec. & Power Co.*, 197 Va. 505, 90 S.E. 2d 140 (1955); *Re Brooklyn Borough Gas Co.*, 100 P. U. R. (N. S.) 271 (1953) (N. Y. Pub. Serv. Commn.); *Complaint of Trustees of Villages of Saugerties and Ellenville*, N. Y. Pub. Serv. Commn., Op. No. 75-5, March 21, 1975. But cf. *In re Petition of Allied Power & Light Co.*, 132 Vt. 354, 321 A. 2d 7 (1974)."

Despite the statement in *Montana Consumer Council v. Public Service Commission, supra*, that "a majority of states" have approved fuel clauses, we have not found a case, nor has one been cited to us in which a court has disapproved the use of the clause in principle.

Finally, we note that on January 6, 1975, the Commission, by its final order on the general rate increase application, approved all interim rate increases theretofore collected by the utility as being fair and reasonable and the entire general

rate increase sought by the utility, noting in the order the effect of the fossil fuel clause, earlier approved, as resulting "in increases or decreases on the basic rate varying with fossil fuel costs" and using as the cost of fossil fuel the same base cost, i.e., $.00513 per KWH, that it approved for use in the fuel clause. There was no appeal which challenged the Commission's approval of the final rate increases. The only appeal was by the Executive Agencies of the United States which challenged a certain change in rate classification and which was decided adversely to the appellant. *Utilities Comm. v. Edmisten, Attorney General*, 291 N.C. 424, 230 S.E. 2d 647 (1976).

## II

[9] Through other assignments of error carried forward in his brief the Attorney General contends the Commission's conclusion that its "system of monitoring the operation of the fossil fuel clause will insure that CP&L acts in accordance with sound management practices in its negotiations, as well as protect the rate payers [from the utility's] recovering more . . . than its reasonable operating expenses" is not supported by any findings of fact which, in turn, are supported by evidence. This statement in the Commission's order is really a finding of fact itself rather than a conclusion of law. The question raised is whether this finding is supported by competent evidence in the record. We believe it is. The Commission's witness, Andrew W. Williams, chief of the Commission's electrical section, testified that the "monthly monitoring of fuel costs and . . . fuel adjustment factors, similar to the monitoring program currently being conducted during the interim operation of the clause, keeps the Commission aware of current fuel prices and their effects on the retail rates subject to fuel clause adjustment. A program of this type helps eliminate" the objections that such a clause may abrogate the prerogative of Commission regulation and that operation of the clause may result in the utility's earning more than its determined fair rate of return. While on cross-examination this witness admitted that the monitoring procedures could be improved if additional personnel were available, his testimony when taken as a whole was sufficient to support this finding by the Commission.

## III

[13] By his exceptions and assignments of error to the Commission's interim order of February 5, 1974, the Attorney Gen-

eral contends that the Commission was without authority to place the fuel clause in effect *ex parte* upon the utility's application on an interim basis pending further hearing and final determination.

There is no merit in this contention. General Statutes 62-134 and 62-135 clearly authorize the Commission to permit rate schedule changes applied for by a utility to be placed into effect on an interim basis before hearing and final determination. There are three ways by which this may occur.

[10] One is that the Commission may refuse to exercise its power to suspend the change applied for or, having exercised it, may before the hearing determine to rescind the suspension in whole or in part. We agree with the decision of the Court of Appeals in *Utilities Commission v. Morgan, Attorney General,* 16 N.C. App. 445, 192 S.E. 2d 842 (1972) and this reasoning which supported it, *Id.* at 451, 192 S.E. 2d at 846:

> "While [G.S. 62-134(b)] gives the Commission authority to suspend changes in rates subject to the time limitation imposed, clearly it does not *require* that it do so. The language is permissive, not mandatory. Further, nothing in the statute indicates a legislative intent that once the Commission exercises its discretionary power and suspends rates, it thereby necessarily exhausts its authority in that regard so as thereafter to be precluded from withdrawing or modifying the suspension. The authority to suspend rates for not more than 270 days clearly includes the power to suspend them for some lesser period. Implicit within the authority granting discretion of whether and for how long to suspend, is the discretion to cancel or modify a suspension once it has been made, and nothing in the language of the statute suggests that the Legislature intended that the Commission could exercise the discretionary authority granted it only if it did so on an all-or-nothing, once-and-for-all basis."

If the Commission does not suspend the rate change applied for it automatically goes into effect at the expiration of the 30 days' notice period provided for in G.S. 62-134(a). *Utilities Commission v. Morgan, Attorney General, supra; see also Antioch Milling Co. v. Public Service Co. of North Ill.,* 4 Ill. 2d 200, 123 N.E. 2d 302 (1954) ; *State v. Department of Transportation of Washington,* 33 Wash. 2d 448, 206 P. 2d 456 (1949) ;

*Baker v. Pa. Public Utility Commission*, 14 Pa. Commw. Ct. 245, 322 A. 2d 735 (1974). Construing Section 205(d) of the Federal Power Act, 16 U.S.C. § 824d(d) (1970), which is almost identical to G.S. 62-134(a), the United States Court of Appeals for the District of Columbia, relying on *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division*, 358 U.S. 103 (1958), said:

> "The Supreme Court has interpreted this language to create not only a *minimum notice period* for the utility's customers and the Commission, but also a *maximum waiting period for the filing utility* . . . . Thirty days is the maximum a utility can be compelled to wait from the time it files its rate changes until the date the changes take effect unless the Commission properly exercises its suspension power." *Indiana & Michigan Electric Co. v. Federal Power Commission*, 502 F. 2d 336, 341 (D.C. Cir. 1974), *cert. denied*, 420 U.S. 946 (1975).

[11]    Another way for rate changes to become effective without a hearing by and order of the Commission is provided for in G.S. 62-135. Under this section, even if the Commission has timely suspended the rate change, the utility may nevertheless place the rate change into effect "upon the expiration of six months after the date when such rate or rates would have become effective, if not so suspended" by giving the statutory notice subject to certain statutory provisos and subject to the utility's filing a surety bond or undertaking approved by the Commission conditioned upon a refund with interest of all rates finally determined to be excessive. This section was enacted "for the purpose of minimizing the effect of the unavoidable time lag between the filing of an application by a utility company for an increase in its rates for service and the entry of an order of the Commission finding such increase proper." *Utilities Comm. v. Power Co.*, 285 N.C. 398, 407, 206 S.E. 2d 283, 291 (1974).

[12]    The third way is for the Commission to exercise its prerogatives under G.S. 62-134(a). This section clearly authorizes the Commission by an affirmative order to "allow" applied for rate changes to go into effect even before the expiration of the thirty days' notice period "under such conditions as it may prescribe." The power to prescribe conditions, like the power to suspend rate changes, includes the power to refrain from pre-

scribing them. Thus the Commission by its affirmative order may *allow* applied for rate changes to become immediately effective conditionally or unconditionally.

[13] In the case before us the Commission, finding "good cause" to do so, properly exercised the prerogatives granted it by G.S. 62-134(a) when it entered its first interim order on February 5, 1974, and its second interim order effectuating *ab initio* the utility's earlier proffered undertaking for refund.

It is important to note that whenever rate changes are *allowed* to go into effect by the Commission under any of the three methods described it is not, generally, nor should it be the end of the rate making proceeding. Article 7 of the Public Utilities Act, G.S. 62-130, et seq., gives the Commission plenary authority to act upon rate changes which it simply allows to become effective: "The Commission shall from time to time as often as circumstances may require, change and revise or cause to be changed or revised any rates fixed by the Commission, or allowed to be charged by any public utility." G.S. 62-130(d). All rates are required to be "just and reasonable." G.S. 62-131(a).

There is moreover in Article 7 a clear statutory dichotomy between rates which are *made, fixed* or *established* by the Commission on the one hand and those which are simply *permitted* or *allowed* to go into effect at the instance of the utility on the other. Rates which are *established* by the Commission, that is after full hearing, findings, conclusions, and a formal order *(see* G.S. 62-81 for the required procedure for general rate cases or proceedings for "an increase in rates") "shall be deemed just and reasonable, and any rate charged by any public utility different from those so established shall be deemed unjust and unreasonable." G.S. 62-132. Rates which the Commission simply allows to go into effect by any of the three methods described are subject to being challenged by interested parties or the Commission itself and after a "hearing thereon, if the Commission shall find the rates or charges collected to be other than the rates established by the Commission, and to be unjust, unreasonable, discriminatory or preferential, the Commission *may"* order refund pursuant to the provisions of G.S. 62-132. (Emphasis supplied.)

## IV

[14]  We now consider the Attorney General's final contention that the Commission's interim order of February 5, 1974, entered *ex parte,* even if it complied with statutory mandates, violates our Law of the Land provision, North Carolina Constitution, Article I, § 19, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. His argument is that these constitutional provisions require due notice to and an opportunity for interested parties to be heard before any general rate change can become effective.

This argument is most easily answered by noting that the order complained of was not an order by which the Commission *made, fixed,* or *established* a rate schedule change, but rather one by which it "authorized and permitted" or in statutory language, "allowed" a rate change sought by the utility to go into effect, pending further hearings and final determination and subject to the utility's undertaking for a refund. In addition to the protection afforded by subsequent hearings and the utility's refund undertaking, any interested party seeking to challenge the rate change would also have been entitled to the benefits of G.S. 62-132 to which we have just referred. The amounts permitted to be collected under the fuel clause by this interim order, had a G.S. 62-132 proceeding been instituted, would have been considered rate charges by the utility "different from those . . . established [and] deemed unjust and unreasonable." If after hearing under this section the Commission had found them to be "unjust, unreasonable, discriminatory or preferential," it could have ordered a refund even absent the utility's agreement to provide one. Whatever procedural rights due process afforded interested parties were thus fully protected. *Holt v. Yonce,* 370 F. Supp. 374 (D.S.C. 1973), *affirmed per curiam,* 415 U.S. 969 (1974) ; *Sellers v. Iowa Power & Light Co.,* 372 F. Supp. 1169 (S.D. Iowa 1974) ; *Baker v. Pa. Public Utility Commission, supra; Hartford Consumer Activist Assoc. v. Hausman,* 381 F. Supp. 1275 (D. Conn. 1974).

The decision of the Court of Appeals is

Affirmed.

Justice LAKE dissenting.

On January 25, 1974, Carolina Power and Light Company (CP&L) had pending before the Utilities Commission a gen-

eral rate case in which it sought a substantial increase in its basic schedules of rates for electric service. On that date, CP&L filed a new application, out of which this appeal arises, seeking Commission approval of its addition to each of its basic rate schedules of a fossil fuel adjustment clause (the fuel clause). The Commission, without notice or hearing, permitted this to be done on an interim basis, consolidated the two proceedings for the purpose of hearing and, several months later, conducted such consolidated hearing.

After such hearing, the Commission re-separated the two proceedings for the purpose of decision and entered separate orders therein. In the first matter (dealing with basic rate schedules), the Commission issued an order allowing the requested rate increases, thus fixing CP&L's basic rate schedules at levels which the Commission deemed adequate to enable CP&L to earn a fair rate of return on the fair value of its properties used and useful in rendering electric service (the rate base). That order is not before us on this appeal. Consequently, for purposes of this appeal, it must be assumed that those basic rate schedules, there approved, would enable CP&L to earn a fair rate of return under conditions prevailing at the time of that order. G.S. 62-132.

Substantially simultaneously (a few days earlier), the Commission entered, in the fuel clause proceeding, the order before us on this appeal permitting CP&L to add to each basic rate schedule a fuel clause.

The final order so permitting the fuel clause to be inserted in the basic rate schedules affirmed the interim fuel clause increases already made but did not further increase the basic rates of CP&L instantaneously. Thus, for the then immediate present, it left the basic rates approved in the order first above mentioned in effect, these, by hypothesis, permitting CP&L to earn a fair return on its rate base under then prevailing conditions.

What the fuel clause did was to give CP&L permission, *in advance and without further hearing,* to increase those basic rates, month after month *ad infinitum,* in each subsequent month in which CP&L's cost of fuel per Kwh exceeded a Commission determined base cost of fuel per Kwh, which it has done every month since the order was issued, the amount

of such excess, and so of the resulting rate incrase, varying month by month.

The basic economic fallacy in using the automatic fuel clause technique to increase, month after month, the rate per Kwh charged the consumers of electric power lies in the unwarranted assumption (asserted by CP&L and accepted by the Commission) that, since each month's rate increase, per Kwh, equals the utility's additional cost of fuel per Kwh, the utility's rate of return on its rate base remains constant and, by hypothesis, fair. The legal fallacy in this method of granting rate increases is that it is not within the Commission's statutory authority, the only authority the Commission has.

By hypothesis, the basic rate schedules of CP&L, as fixed by the Commission's order first above mentioned, as of the date fixed, were sufficient to yield a fair rate of return on the utility's rate base, and no more. G.S. 62-132. This condition will continue indefinitely, so long as the utility's total expenses per Kwh, its total Kwh sales and its cost of capital (a fair rate of return) all remain constant. This condition will also continue indefinitely so long as all of these remain constant except one item of expense (e.g., fuel) and variations therein are precisely balanced by variations in the rate per Kwh charged the consumers of electric power. The theory of the fuel clause is that this latter situation is a reality. That is the economic fallacy in the fuel clause method of rate making.

The whole thrust of CP&L's evidence in support of its application for substantial increases in its basic rate schedules (now before us in another appeal on an unrelated question in Case No. 47, Fall Term 1976) is that it has sustained and for a long time to come anticipates a steady and substantial growth in the demands upon it for electric power and, therefore, must build extensive additions to its utility plant, expecially its generating facilities. Thus, as of the time the fuel clause was put into its rate schedules, its Kwh sales were not, and were not expected to remain, constant, or even relatively so. Obviously, as Kwh sales increase, so does the total expenditure for fuel, but the fuel clause increases the rate per Kwh sold only in the amount that fuel cost per Kwh increases, so an increase in generation of power does not, per se, cause a fuel clause rate increase. However, the record shows, by testimony of CP&L's president, that fuel cost is only 57% of "operating

and maintenance" expense. That is, almost an equal portion of "operating and maintenance" expense is composed of other items, including salaries and wages, and materials and supplies other than fuel. While common experience, known as of the date the fuel clause was approved, would lead to the expectation that wage levels would also rise and the then expected addition to the utility plant of huge new nuclear generating facilities would necessitate some additions to operating personnel, nothing in the record before us shows or suggests that the company's expenditures, in months following the approval of the fuel clause, for wages, salaries, and materials and supplies other than fuel would not decline per Kwh sold, or that these expenses have not actually declined per Kwh sold.

Depreciation expense is separate and apart from the "operating and maintenance" expense of which fuel cost is 57%. So is tax expense. Thus, CP&L's expense for fuel is far less than half of its total expenses, both in gross and per Kwh.

The record shows CP&L, at the time these orders were issued, contemplated (and it has since made and still contemplates) huge investments of capital for the construction of additional nuclear generating plants. The fuel clause reflects the effect of nuclear generation upon the cost of fuel per Kwh, but it ignores all other effects of CP&L's progressive switching from fossil fuel generation to nuclear generation upon CP&L's total expenses per Kwh. Obviously, this switch to nuclear generation means much more property to be taxed and depreciated and many more dollars in the annual or monthly charge to depreciation expense. But, these new plants will increase tremendously the kilowatt hours sold. Otherwise, there would be no point in building them for they are not intended to be immediate replacements of existing plants. Will the depreciation expense per Kwh be constant in future months? Has it been during the life of the fuel clause? That is highly improbable. Will it be, or has it been, greater or less than the depreciation expense per Kwh taken into account by the Commission in its order setting the basic rate schedules? No one can tell from the record before us. Will nuclear plants depreciate at the same rate per year or per month as steam plants? The record before us does not answer this question.

A well managed electric utility, such as CP&L, steadily improves its efficiency and generates and sells more and more Kwh per employee and per employee hour. Thus, wage rates

and total dollar expense for wages may go up while wage costs per Kwh declines. Even greatly increased executive salaries may be less per Kwh sold. Depreciation charges may rise spectacularly in total dollars while depreciation charges per Kwh sold decline. So it is with property tax expense, maintenance expense, and expense for materials and supplies other than fuel.

The fuel clause approved by the Commission permits CP&L to raise its rates, month after month, by looking solely at the rising cost of fuel per Kwh and utterly ignoring what has happened to the substantially larger (in the aggregate) expenses per Kwh for depreciation, taxes, wages, salaries, and materials and supplies other than fuel.

In the present context total dollar variations and variations percent are not useful data. What is needed is a computation of wage and salary expense, depreciation expense, tax expense and miscellaneous expense per Kwh sold, so as to reduce these expense items and the fuel expense item to a common denominator. Then, and only then, can the Commission, or the reviewing court, determine whether an increase in fuel cost per Kwh has been offset, *in whole or in part,* by decreases in other costs per Kwh. If such offset has occurred, *in whole or in part,* the fuel clause increase produces an increase in the utility's rate of return, which, by hypothesis, is made adequate by the basic rate schedules.

This total picture has not been shown in the present record and, obviously, the fuel clause does not require it to be developed and taken into account before month by month rate increases are made on account of an increase in fuel cost per Kwh. No one can determine from the present record, and no one can determine from data required to trigger future rate increases under the fuel clause, whether in any given month there has been a decline in wage expense per Kwh sold, or in depreciation expense per Kwh sold, to offset, *in whole or in part,* the increase in fuel expense. It is entirely possible, for aught that appears in the record before us or aught that the fuel clause requires to be taken into account in any month, that wage, salary, depreciation, tax, maintenance, materials and supplies expenses per Kwh sold may, in the aggregate, have declined even more than fuel expense per Kwh sold has risen.

My dissent is not on the ground that CP&L, month after month, during the life of the fuel clause pursuant to the Com-

mission's order, has not needed a rate increase in the amount computed pursuant to the fuel clause. It may be that, were the missing data, above mentioned, shown, an even greater rate increase would be or would have been appropriate. My dissent is on the ground that the evidence in this record does not show, and the data required to trigger a rate increase under the fuel clause will not show, such need for a rate increase in any month for the reason that it is utterly impossible for the Commission, or this Court, to determine from this record, or from such data as is required under the fuel clause, whether the month by month increase in CP&L's expense for fuel per Kwh sold has been offset, *in whole or in part,* by a decrease in other expenses per Kwh sold.

If, in any given month of the life of the fuel clause there has been such offsetting decrease, *in whole or in part,* in other items of expense, then the increase in electric service rates in that month, pursuant to the fuel clause, necessarily raised CP&L's rate of return above that found proper by the Commission when it fixed the basic rate schedules, from which determination no appeal was taken by CP&L. Such rate increase would, in my view, be clearly in excess of the Commission's statutory authority. The Commission has no other authority and this Court can, of course, give the Commission no authority. *Utilities Commission v. Merchandising Co.,* 288 N.C. 715, 722, 220 S.E. 2d 304 (1975); *Electric Service v. City of Rocky Mount,* 285 N.C. 135, 203 S.E. 2d 838 (1974); *Utilities Commission v. Telephone Co.,* 281 N.C. 318, 336, 189 S.E. 2d 705 (1972); *Utilities Commission v. R. R.,* 268 N.C. 242, 245, 150 S.E. 2d 386 (1966); *Utilities Commission v. Motor Lines,* 240 N.C. 166, 81 S.E. 2d 404 (1954).

What the Commission has done is this: (1) It fixed basic rate schedules which, as of that date, were sufficient to yield to a well managed utility a fair rate of return on the fair value of its properties used and useful in supplying electric services; (2) it has said to CP&L, "From now on into the indefinite future, without further hearing, you may raise these rates in any month in which your fuel expense per Kwh sold is greater than it is now, irrespective of what happens to all your other expenses per Kwh sold." This second part of its order (actually two separate orders) is, in my view, a clear violation of the statutes prescribing the manner in which rate increases may be authorized.

Clearly, the fuel clause proceeding was a general rate case, for the fuel clause applies to every rate schedule the company has. G.S. 62-137; *Utilities Commission v. Area Development, Inc.*, 257 N.C. 560, 567, 126 S.E. 2d 325 (1962); *Utilities Commission v. Light Co.*, and *Utilities Commission v. Carolinas Committee*, 250 N.C. 421, 430, 109 S.E. 2d 253 (1959). The fuel clause authorizes, prospectively, an indefinite series of general rate increases month after month, with no hearing, no finding of need and no evidence whatever as to anything but one single item of expense.

It may well be that rate making by formula is preferable, more efficient and fairer both to the utility and to the public, than is the long, laborious, expensive, inexact and dilatory procedure prescribed by Chapter 62 of the General Statutes. If so, both fairness and efficiency would surely require that the formula include determination of the other items of utility expense by Kwh—depreciation, maintenance, wages and salary, materials and supplies, taxes and miscellaneous—along with fuel expense. It would seem entirely feasible to determine all these expenses per Kwh, month by month, by relatively simple, speedy, inexpensive and reasonably accurate accounting techniques, leaving the rate base and the fair rate of return thereon for much less frequent determination by the Commission in the now customary way prescribed in G.S. 62-133. Obviously, there is no constitutional barrier to this type of short-term rate change when the utility whose rates are being fixed does not object thereto. Accuracy in computation and application of expense data to the month in which service is rendered could be had by deferring the billing of the customer until a few days after the end of the month in which the service is rendered. Such a rate making formula may well furnish more protection to the rate-paying public than does a friendly, drowsy watch dog bound by the red tape of an obscure statute.

This, however, is for the Legislature. Defects in the existing statute causing long, tedious, expensive and inexact proceedings do not authorize the Commission, or a reviewing court, to rewrite or ignore the statutory requirements for making general changes in utility rates. The words of Justice Barnhill, later Chief Justice, speaking for this Court concerning the predecessor to the present G.S. 62-133 in *Utilities Commission v. State*

and *Utilities Commission v. Telegraph Co.*, 239 N.C. 333, 344, 80 S.E. 2d 133 (1954), are presently appropriate. He said:

"This statute has been characterized as an 'old, rambling and misty statutory declaration of the matters to be taken into account by the commission . . .' 12 N.C. L. (Review) 298. Be that as it may, it is the law in this State and will continue to be the law until amended, revised, or repealed by the Legislature. We have no intention to shut our eyes to its provisions or to circumvent the clear import of its language."

The statutes, in my view, clearly forbid general rate making by expense formula (even one which takes into account all elements of expense). When the Commission oversteps its authority it is the duty of the reviewing court to set aside its order, even though the order may seem to reach a result reasonable per se. G.S. 62-94(b) (2).

Each major electric utility serving North Carolina has collected from its customers within the past three years many millions of dollars pursuant to its fuel clause, all such clauses being structured as is that applied by CP&L. In my opinion, these collections have been unlawfully made. To require them now to be refunded would very likely be a severe financial jolt to the respective companies. They have, however, had the use of these huge sums, for periods up to nearly three years, without interest, in a time of unprecedentedly high interest rates and it is not the fault of the rate-payers or of the Attorney General that these unlawful collections have snowballed into such huge amounts.

Immediately, upon the issuance of each of the orders of the Commission initiating the fuel clauses, the then Attorney General, on behalf of the consumers of power, sought judicial determination of their lawfulness, pointing out the danger to the utility in delayed judicial review. The Court of Appeals, upon the respective motions of the utilities involved, refused to consider the merits of the orders, saying the appeals were premature. See: *Morgan, Attorney General v. Virginia Electric and Power Co.*, 22 N.C. App. 300, 206 S.E. 2d 338 (1974); *Morgan, Attorney General v. Duke Power Co.*, 22 N.C. App. 497, 206 S.E. 2d 507 (1974). In those cases this Court denied certiorari and dismissed appeals to it. 285 N.C. 758 (1974). The dismissal of the then appeal in the present matter does not appear to

have been reported in the reports of the Court of Appeals. This Court, having denied certiorari in the Vepco and Duke cases, certiorari was denied in the present matter.

G.S. 62-134(e) has no application to this case, it having been enacted subsequent to the order of the Commission to which this appeal relates. G.S. 62-133(b) prescribes in detail the procedure which the Commission must follow in fixing rates in a general rate case such as this. The Commission quite obviously did not even purport to follow this statute in the matter of the month by month fuel clause increases. Its order approving the fuel clause is, therefore, clearly in excess of its authority and, consequently, is a nullity conferring upon CP&L no right whatever to collect any rate in excess of those prescribed in its basic rate schedules approved by the Commission. It is true that the fuel clause was finally approved by the Commission following a hearing in which the fuel clause matter was consolidated with a previously pending application for an increase in basic rate schedules. Assuming that hearing and findings made upon the evidence received thereat were adequate to support the Commission's order as to those basic rate schedules, which reflected the then level of fuel expense per Kwh, the order authorizing further, month by month, general rate increases, pursuant to the fuel clause, in what was then the future, was not in accord with G.S. 62-133(b) since those further general rate increases were to take effect, and did take effect, with no further hearing such as G.S. 62-133(b) requires.